## STATE

v.

## Rafael DIAZ.

### No. 82–138–C.A.

Supreme Court of Rhode Island.

Feb. 4, 1983.

---

Dennis J. Roberts, II, Atty. Gen., Charles Nystedt, Jr., Sp. Asst. Atty. Gen., for plaintiff.

Joseph A. Bevilacqua, Jr., Providence, for defendant.

## OPINION

KELLEHER, Justice.

A Superior Court jury found the defendant, Rafael Diaz (Diaz), guilty of second-degree murder. Thereafter, the trial justice denied Diaz's motion for a new trial and imposed a thirty-five-year prison sentence. On December 7, 1982, the state appeared before this court and attempted to show cause why Diaz's appeal should not be summarily sustained because of the state's failure to comply with the continuing duty to disclose pertinent information of Rule 16(h) of the Superior Court Rules of Criminal Procedure.

Around the beginning of August 1980, Diaz, who was then twenty-two years old, and Nancy Nigron, who was fifteen years old, and the couple's infant child moved into a second-floor apartment located at 7 Congress Avenue. Nancy's mother, her two brothers, and her sister Carmen occupied the first-floor apartment in the building next door at 11 Congress Avenue. Nancy's other sister, Justa, also lived at 11 Congress Avenue in an apartment situated on the second floor.

Nancy was last seen by her sister on Tuesday afternoon, August 19, 1980. Later that day, at approximately 11:30 p.m., Nancy's sister, who had retired for the evening, found that her efforts to obtain sleep were impeded by loud music emanating from the Diaz apartment. The sister opened her kitchen window and appealed for a cessation of the clatter, but her request went unanswered. Subsequently, the sister fell asleep.

The next morning, August 20, Diaz left the baby with Nancy's mother and told her that Nancy had left him and had gone to New York. When Nancy's sister Justa asked Diaz about the scratches on his neck, Diaz attributed them to Nancy. The sister testified that Diaz and Nancy were "always fighting." Diaz spent Thursday evening at his sister's house while the couple's child was being cared for by Nancy's mother.

On Friday Diaz told the mother that he was going to New York. However, on Saturday, after learning that Diaz was actually leaving the United States to go to the Dominican Republic, the mother entered Nancy's apartment for the express purpose of

obtaining some clothing for the baby. When she entered the premises, she and others noticed a strong odor that appeared to be emanating from behind a door that opened onto an attic stairway. They also noticed that nails had been hammered into the doorframe in such a manner that the nails had to be removed before the door could be swung open. Once the door was opened, the mother went up the stairs into the attic, where she discovered her daughter's body lying on top of a mattress. An autopsy disclosed that Nancy had died of strangulation.

Diaz returned to the United States. When he was interrogated in New York, he told the arresting officers that the strangulation came about as he was attempting to defend himself against Nancy, who at the time, he alleged, was wielding a knife.

The grand jury for Providence and Bristol Counties returned the murder indictment against Diaz on October 17, 1980. A month later, on November 17, 1980, Diaz's counsel filed a motion pursuant to Super.R. Crim.P. 16, in which he asked to inspect and copy a variety of items in the state's possession, including a written list of the names of those individuals whom the state expected to call as witnesses in support of the indictment, as well as a summary of the testimony each individual was expected to give at trial. On January 20, 1981, the state responded by listing the names of thirteen potential witnesses and enclosed statements and reports, all of which related to the witnesses' trial testimony.

On Thursday, April 23, 1981, the case came on before the trial justice. He first conducted a hearing on Diaz's motion to suppress. The hearing concluded on Thursday, April 30, at which time the trial justice denied the motion in part and granted it in part. The trial justice noted that since the next day, Friday, May 1, was Law Day 1981, he was obligated to attend the exercises marking Law Day which are held annually before this court. Consequently, he recessed the proceedings until the following afternoon, noting that upon his return to the bench the jury-impaneling process would begin. However, the transcript indicates that during this period plea-bargaining efforts had been carried on that came to a halt when the police informed the prosecutor that trial was a necessity. Thus, the impaneling process did not begin until Tuesday, May 5.

The record indicates that while Law Day was being celebrated, the prosecution amended its discovery responses with the May 1 submission of an amended response, which listed the names of nine additional potential witnesses. One such individual was Angel Soto, the victim's ten-year-old brother. The amended response also indicated that Angel would testify (1) about his having discovered the body, (2) about his seeing Diaz during the period August 18 to August 23, and (3) about the door that was nailed shut. The amended list also contained the names of other kin of the victim, her sisters, Carmen and Justa. They too, like Angel, were to testify about seeing Diaz during the period from August 18 through August 23.

On Thursday, May 7, the prosecution called ten-year-old Angel to the stand. He told the jury that there had been times when he had stayed overnight upstairs at Nancy's, where he slept in the baby's room on a mattress and frame that rested on the floor. When asked by the prosecutor if something had happened to the mattress and frame, the brother responded, "Yes. One night when I was going over there, Rafael Diaz took my bed up to the attic and he said I couldn't sleep there anymore. I kept on asking him why and he said, no, you can't sleep [there] because something bad was going to happen." At this point, Diaz's trial counsel moved to pass the case because at no time in its May 1 amended response did the state indicate that Angel would testify about Diaz's removing the mattress to the attic "because something bad was going to happen." This conversation supposedly took place on Monday, August 18.

The prosecutor saw no problem in regard to the amount of information supplied on

May 1. The trial justice, while believing that it might have been appropriate to include the substance of Angel's conversation with Diaz, saw nothing fatal in the failure to include "one element, although important" because Diaz was on notice that Angel would testify "on some substantial subjects." The trial justice was of the belief that Angel's testimony had not prejudiced Diaz to the degree that a mistrial was called for. We disagree.

Our disagreement with the trial justice's finding is not based upon a belief that his rejection of the motion to pass amounted to an abuse of discretion. Rather, we are of the opinion that the trial justice has misconceived certain pertinent evidence. With all due deference to the trial justice, there is nothing in the state's cryptic summary of Angel's proposed testimony which would have alerted defense counsel to the fact that Angel was going to testify about a conversation he had had with Diaz which would constitute direct evidence of premeditation, the existence of which is essential if one is seeking a verdict of murder.

Furthermore, the trial justice, in refusing on May 7, 1981, to pass the case after Angel had testified about his "something bad was going to happen" conversation with Diaz, obviously overlooked the prosecutor's earlier admission that he had interviewed Angel "maybe ten days ago." Angel testified that he had first told the prosecutor and the police about his conversation with Diaz before "we came to court." The prosecutor's admission plus Angel's report of his initial contact with the prosecutor clearly indicate that the prosecutor and the police were well aware of what Angel was going to say on the witness stand in the final days of April 1981.

The trial of a criminal case is not to be considered a poker game in which each player holds his cards close to his vest. It is, as are all trials, a search for the truth. The prosecution's conduct is inexcusable. It was well aware in late April what Angel *was* going to say in May, but it summarized his future testimony in such a fashion that nobody but a psychic could foresee that Angel's job was to establish the element of premeditation. Diaz's conviction cannot stand, for, as noted by this court in *State v. Darcy,* R.I., 442 A.2d 900, 903 (1982), "[a]n attorney who expects, by reason of reliance upon the rules, that honest, accurate, and complete answers will be given in response to discovery requests can scarcely be effective if his expectations are wholly shattered in the course of a trial."

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remanded to the Superior Court for a new trial.

BEVILACQUA, C.J., did not participate.