STATE

v.

James J. POWERS.

No. 82–574–C.A.

Supreme Court of Rhode Island.

June 1, 1987.

William E. Reilly, Public Defender, Barbara Hurst, Janice M. Weisfeld Asst. Public Defenders, Providence, for plaintiff.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., Providence, for defendant.

## OPINION

MURRAY, Justice.

The defendant, James J. Powers, was convicted of robbery and murder. He appeals.

At about 10 p.m. on July 3, 1981, Adam Mowry and Pauline Krueger were sitting in front of the Pilgrim Lutheran Church across from the E Mart gas station on Warwick Avenue in Warwick, Rhode Island. They saw a man wearing a nylon stocking over his head and holding what appeared to be a small handgun emerge from the wooded area behind the gas station and enter the station office. The man, who was wearing jeans and a denim jacket, grabbed the night attendant. A shot rang out and the attendant fell. The masked man ran out of the office and over to the corner of the building, then turned and went back into the office. He ran back out carrying a small box, then headed through the wooded area behind the station. Mowry ran after the masked man but was unable to catch him. Krueger found the attendant, a seventeen-year-old boy, in the office lying on his back. He was bluish in color and there was blood on the floor.

Within minutes the police arrived. Sergeant Marky Carnahan observed the young victim lying on the floor, bleeding from the nose and from the back of the head. The victim was not breathing and Sergeant Carnahan found no pulse. The sergeant began mouth-to-mouth resuscitation and chest massage and was able to restore the victim's breathing and pulse.

Two hours later, however, at Kent County Memorial Hospital, the victim was pronounced dead. According to the state medical examiner the cause of death was a gunshot wound to the neck, inflicted at close range.

At trial the owner of the E Mart gas station testified that the next day he discovered $366 and a cigar box with some change in it missing.

Antonetta D'Ambra testified that shortly after 10 p.m. the night of the robbery, defendant appeared unexpectedly at her home, a short distance from the E Mart. Mrs. D'Ambra testified that she heard sirens outside and asked defendant whether the police were looking for him. The defendant said that he had been in a fight with some boys, but that the police were not after him. He added that he was supposed to meet Mrs. D'Ambra's son, Peter D'Ambra, there at her home.

Mrs. D'Ambra's daughter, Norma Bloom, testified that she was with Mrs. D'Ambra when defendant arrived. She said that defendant was wearing what looked like a denim jacket and jeans. Norma called her brother, Peter, and gave the phone to defendant, who asked Peter to come pick him up. Peter arrived a short time later and left with defendant.

Donna Jean Simas testified that she lived with Peter D'Ambra and was with him at their apartment on the night in question. At about 10 p.m. she received a phone call from someone wishing to speak with Peter. Peter took the phone and spoke for a few minutes, hung up, and asked to borrow Simas's car to go to his mother's. He took the car and picked up defendant at Mrs. D'Ambra's house. They returned to the apartment together.

Peter D'Ambra testified that during the last week of June 1981 defendant had asked him if he could get a gun for defendant. Peter testified that he had obtained a gun and had lent it to defendant the early evening of July 3. The gun was a .22-caliber handgun. When the two returned to Peter's and Simas's apartment, Peter retrieved the gun from defendant. Peter testified that defendant admitted to robbing the gas station and to shooting the attendant.

Raymond Ross testified that he was asked by defendant the evening of July 3 where defendant could get some .22-caliber bullets. Ross didn't know. Ross also testified that three or four weeks earlier defendant had asked him where defendant could get a gun.

Colleen McCabe testified that at about 5 p.m. on July 3 she received a phone call from defendant during which defendant asked her if she wanted to go out and eat with him later that night. She asked defendant how he planned on eating out since he didn't have any money. The defendant told her he would get some money. McCabe asked him how, and he said "the only way he knew how." She did not see him later that evening.

McCabe also testified that she had been in California with defendant some weeks before July 3 and that at that time he had told her he was going to return to Rhode Island "to make money." He said that after he returned to Rhode Island, he was going to try to get a gun.

Gary LeMay testified that on July 18 he spoke with defendant in Whittier, California. The defendant told LeMay that defendant had been questioned by Warwick police about a murder. When LeMay asked if defendant did it, defendant replied, "[Y]es, I killed the fuckin' kid." The defendant said he held up the gas station attendant with a .22-caliber gun, and because "he thought that the guy noticed his face, his mask, he turned him around and he shot him."

The defendant took the stand on his own behalf. He admitted to being a professional thief with an extensive criminal record and to wanting a gun in early July to "make some money" for himself, but denied robbing the gas station or shooting the attendant. Peter D'Ambra was the responsible party, defendant maintained.

The jury convicted defendant of robbery and of felony murder, with robbery as the underlying felony. The trial justice sentenced him to life imprisonment for the felony murder, but did not impose sentence for the robbery.

On appeal defendant objects to rulings by the trial justice concerning (1) the admission of various evidence not produced in discovery, (2) the scope of cross-examination of Gary LeMay, (3) the jury's awareness that defendant was in custody, (4) the statement by a witness that defendant had previously been in prison, (5) the admission of evidence of the circumstances surrounding defendant's arrest, and (6) the robbery conviction.

Because we feel that resolution of one of the discovery issues on remand might well be dispositive of the case we need not reach, at this time, defendant's other contentions, except we reverse his robbery conviction. All of the defendant's arguments are, of course, preserved, should the case again reach us on appeal.

■ Rhode Island's criminal-discovery provision, Rule 16 of the Superior Court Rules of Criminal Procedure, is one of the most liberal criminal-discovery mechanisms in the United States. *State v. Darcy*, 442 A.2d 900, 903 (R.I. 1982). The rule, which requires extensive pretrial disclosure of facts, was designed to be broad in scope so that neither the defense nor the prosecution is surprised at trial. *State v. Wyche*,

518 A.2d 907, 910 (R.I. 1986). The rule helps to ensure the accurate determination of the guilt or innocence of the accused. *State v. Quintal*, 479 A.2d 117, 119 (R.I. 1984).

The defense in this case requested "all relevant written or recorded statements or confessions, signed or unsigned, or written summaries of oral statements or confessions made by the defendant, or copies thereof." Rule 16(a)(1) states:

"Discovery and inspection.—(a) Discovery by Defendant. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

(1) all relevant written or recorded statements or confessions, signed or unsigned, or written summaries of oral statements or confessions made by the defendant, or copies thereof."

At trial the prosecution introduced the testimony of several witnesses to rebut the testimony of defendant, who took the stand on his own behalf. The record indicates that the prosecution's sole purpose in calling three of these rebuttal witnesses was to elicit from each of them a distinct prior statement made by defendant. The defense objected to the introduction of each of the statements, one of which had previously been disallowed by the trial justice when the prosecution sought to elicit it from the same witness during its case in chief. The defense argued that it had received none of the statements, as requested, in discovery.

The first of the three statements came in through Warwick Police Lieutenant William Morgan III. Morgan testified that he had spoken with defendant on July 10 or 11, 1981, about the robbery and murder at the E Mart a week earlier. Morgan said that defendant told him at that time, "[T]he only person that can get me, is me." On cross-examination Morgan said that he had not made any notes of the conversation, nor had he included it in any reports.

The second statement came in through Warwick Police Detective Jerome Bessell, who had previously testified for the state during its case in chief. Bessell was apparently part of the prosecution team; he had been sitting at counsel's table through the entire trial. The statement, which Bessell said defendant related to him on July 9, 1981, when Bessell was investigating the scene of the crime, was, "[D]o you think that I could have done this?" It is not clear whether the statement itself was recorded verbatim by Bessell, but on cross-examination Bessell admitted that in his "report" he had "stated a short conversation between [him]self and Mr. Powers." He also corroborated Morgan's testimony, stating that he had heard defendant relate to Morgan the statement Morgan had attributed to defendant.

When Bessell was first called as a witness for the state during the state's case in chief, the trial justice would not allow him to testify to defendant's July 9 statement. The justice told the prosecutor, who had been arguing that the statement was admissible, that Rule 16(a)(1) precluded its admission:

"THE COURT: Well, what troubles me about this is that when the rule requires the statements be given [to the defense during discovery] or [a] summary of the statement, the rule speaks for itself. It does not mean that defense counsel have to [get] a pair of pliers and thin wire and pull it out of the Attorney General's file. The rule says you furnish a statement based on what you are telling me the statement is. I really don't see that it is anything that's so earth shaking to the State's case. On the other hand, it could portray the defendant in a bad light and I think I have got to weigh everything and decide whether or not it should come in. If it was something totally crucial, I might reconsider, but in view of what you tell me the statement is, I think it is really not something that I should permit. If you have not given the statement in the past, to defense counsel, then, I

know what you are going to say—it was always available, they had an idea, and it was given—all of that, but, again, the rule is [a] self-executing rule. It means that when they ask you for information, you give it to them. If you don't give it to them and you want them to come back and force it, [we] run into problems and I think there are enough problems in this case and [I am] not going to put any new problems in and I am going to keep the statement out."

Nevertheless, the prosecutor called Bessell during rebuttal, apparently for the sole purpose of eliciting from him the very statement the trial justice had previously (and properly) ruled inadmissible, and got the statement into evidence.

The third statement came in through Bessell's partner, Detective Sergeant Mark F. Tripp, who had also testified during the state's case in chief. During rebuttal Tripp testified that he and Bessell had gone to the detectives division of Providence police headquarters on September 11, 1981, to interview defendant, who had been arrested, about the E Mart robbery and murder. The defendant was advised of his rights orally and in writing, and signed a rights form. Bessell and Tripp then interviewed him about the E Mart incident, at which time, Tripp testified, "[Defendant] said, when we had somebody that saw him pull the trigger, if he did it, then we would have something. Until such time as that, in effect, [we] had nothing. Then, he went on to say, all we had is what people had told us." [1]

Defense counsel, on cross-examination, established that defendant's statement to Tripp had been recorded:

"Q. Did you make any report of this conversation?

"A. Yes, sir, I did.

"Q. And is that somewhere in the Warwick Police Department reports?

"A. It should be in the case, itself, yes, sir.

"Q. It is in writing?

"A. I typed it."

In *State v. Darcy*, 442 A.2d 900 (R.I. 1982), this court reversed the conviction of the defendant because the prosecution had elicited from a witness an incriminating statement made by the defendant and not produced in discovery as requested. In *Darcy* it was not clear that the incriminating statement was recorded or that it had been in the possession of the prosecution team for some time prior to the statement's being elicited at trial. Nevertheless, we reversed the conviction. Our rationale was as follows:

"Justifiably relying on the prosecution's assertion that it possessed no statements attributable to defendant, defense counsel was not prepared to counter the inculpatory evidence by way of cross-examination or otherwise. The introduction of the previously undisclosed statement may have denied defendant the opportunity required by due process to establish the best available defense. Further, the admission of the unexpected testimony may have diluted the effectiveness of defendant's representation, thereby adversely affecting his federal and state constitutional rights to counsel. This right to the assistance of counsel is one of the fundamental elements of the due-process right to a fair trial.

"Moreover, it would be unfair to allow the state the tactical advantage of suprise gained by violating, whether intentionally or unintentionally, the rules of discovery. It is axiomatic that due process accords to criminal defendants the right to a fair trial. The defendant, having no prior notice whatsoever that the prosecutor possessed the statement attributed to him, learned of its existence along with the jury. * * * An attorney who expects, by reason of reliance upon the rules, that honest, accurate, and complete answers will be given in response to discovery requests can scarcely be effective if his expectations are wholly shattered in the course of a trial. His

---

[1]. This is the statement Tripp testified to during cross-examination. It is a slightly different version than what Tripp said on direct, which was, "[Defendant] made the statement that when we had somebody that pulled the trigger, if he did it, and until then, we had nothing."

reaction will be one of surprise and occasionally consternation. In the instant case both reactions must have occurred.

\* \* \* \* \* \*

We do not believe in this instance that any remedy other than a mistrial would have eradicated the prejudicial effect caused by the violation of Rule 16. Curative instructions would have been of no assistance, and even a continuance within the trial itself (a remedy that was not requested) would not have given counsel the requisite time to reassess his defense in the light of this new evidence. Once this extremely prejudicial and unanticipated evidence was admitted, only a mistrial would have placed the defendant in a position to prepare to meet its effect at a subsequent trial." Id. at 903 (citations omitted).

In *State v. Diaz*, 456 A.2d 256 (R.I. 1983), we reversed the defendant's murder conviction because the prosecution had not revealed that one of its witnesses was going to testify to an incriminating statement made by the defendant. We found that the prosecutor had deliberately suppressed this information, which had been requested by the defense in discovery, and said:

"The trial of a criminal case is not to be considered a poker game in which each player holds his [or her] cards close to his [or her] vest. It is, as are all trials, a search for the truth. The prosecution's conduct is inexcusable." *Id.* at 258.

In *State v. Heredia*, 493 A.2d 831, 833 (R.I. 1985), we found "from the tenor of the direct examination by counsel for the prosecution" that the prosecutor had deliberately tried to elicit information not turned over in discovery from a police officer on the witness stand. Because the

2. It does not matter that the statement introduced through Morgan had not been reduced to written form. Both Morgan and Bessell knew of the statement, and Bessell was apparently part of the prosecution team. Because of the statement's incriminating nature it should have been turned over to the defense, and had to be turned over if it was going to be used at trial. See State v. Wyche, 518 A.2d 907, 910–11 (R.I. 1986); State v. Darcy, 442 A.2d 900 (R.I. 1982).

information should have been turned over under Rule 16, we reversed. The failure to disclose the officer's testimony before the officer took the stand, we said,

"was, at best, a violation of the continuing duty to update discovery materials. \* \* \* Consequently, we are constrained to view this violation not as inadvertent but as deliberate, as a part of the state's trial strategy. Therefore \* \* \* 'we will grant a new trial without inquiry into the degree of harm caused by the misconduct.'" *Id.* (quoting *State v. Concannon*, 457 A.2d 1350, 1353 (R.I. 1983)).

■ The primary duty of a prosecutor is to achieve justice, not to convict. This court will not countenance prosecutorial misconduct. *State v. Wyche*, 518 A.2d 907 (R.I. 1986); *State v. Heredia*, 493 A.2d 831 (R.I. 1985); *State v. Adams*, 481 A.2d 718 (R.I. 1984); *State v. Diaz*, 456 A.2d 256 (R.I. 1983); *State v. Darcy*, 442 A.2d 900 (R.I. 1982). It would be a fraud and a sham indeed to call a system of justice one in which an accused, who already must defend against the full prosecutorial machinery and investigative resources of the government, is allowed to be ambushed by the prosecution at the trial which is the one opportunity he or she has to clear his or her name.

■■ In this case it appears, as was the situation in Heredia, that the only reason the prosecution called the three police officers to testify in rebuttal was to elicit from them incriminating statements made by defendant. If so, and if the prosecution had not previously made available to the defense those exact statements as requested, defendant is automatically entitled to a new trial.[2] *Wyche*, 518 A.2d at 911; *Heredia*, 493 A.2d at 833.

The state's argument that the statements were admissible because they came in through its rebuttal case is baseless. Rule 16(a)(1) of the Superior Court Rules of Criminal Procedure includes no language supporting such a contention. A prosecutor may not apply his or her own limiting construction to the rules of discovery. State v. Adams, 481 A.2d 718, 724 (R.I. 1984); State v. Verlaque, 465 A.2d 207, 214 (R.I. 1983).

■ Because the defense did not specifically allege, however, either below or on appeal, that the prosecution deliberately withheld these particular statements, we feel that in the interest of fairness to both sides the case should be remanded for an evidentiary hearing. At that hearing, if the defense indeed alleges deliberate withholding of the statements by the prosecution, the prosecution will have the burden of proving by clear and convincing evidence that it did not know of the existence of the statements anytime before they were testified to by the witnesses on the stand, or, if it did know of the statements, that they had been made available to the defense, as requested, at the earliest available time. If the prosecution fails to meet its burden, defendant is to be afforded a new trial.

■ If the defense does not allege deliberate withholding by the prosecution, the trial justice is to make a finding, in accord with our decision in *State v. Coelho*, 454 A.2d 241, 245 (R.I. 1982), as to whether defendant suffered procedural prejudice as a result of any misconduct or inadvertence on the part of the prosecution regarding these statements. In determining whether procedural prejudice resulted, "the trial justice must determine whether the discovery violation prevented the defendant from properly preparing for trial." *Id.* A criminal defendant who suffers procedural prejudice is entitled to a new trial.

■ On remand the trial justice is also directed to vacate defendant's robbery conviction. The jury found defendant guilty of both robbery and felony murder with robbery as the underlying felony. In such a situation the underlying felony merges into the murder conviction, and defendant thus cannot be convicted of both. *State v. Innis*, 120 R.I. 641, 658, 391 A.2d 1158, 1167 (1978), *rev'd on other grounds*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). To do so would be to violate defendant's constitutional right to not be twice placed in jeopardy.

The case is thus remanded.