STATE

v.

**John WYCHE, Jr.**

**85–460–C.A.**

Supreme Court of Rhode Island.

Dec.. 9, 1986.

Arlene Violet, Atty. Gen., Thomas Dickinson, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

FAY, Chief Justice.

The defendant appeals from a denial of a motion for new trial by a Superior Court justice following a jury conviction of first-degree sexual assault. Although the defendant raises more than one ground for appeal, we find the issue of the state's discovery violation to be dispositive of the matter.

The facts in this case are as follows. At about 12:30 a.m. on June 19, 1984, Carmen Garcia (Garcia) left her third-floor apartment at 182 Adelaide Avenue in Providence for a local drinking establishment one block away. She remained at the bar until its 2 a.m. closing, during which time she consumed two beers.

Garcia proceeded directly home after the bar closed. Arriving at the apartment house, she was struck by an urgent need to use the bathroom facilities. She knocked on the first-floor-apartment door of John Wyche, Sr., defendant's father, asked to use his bathroom, and was admitted. Garcia intended to leave after using the facili-

ties but was persuaded to join a small party that was under way in the apartment.

Garcia remained at the party talking to other guests (excluding defendant) and drank two large glasses of whiskey over a thirty-minute period. Feeling ill, she went out onto the front porch of the house for a breath of fresh air. The defendant, John Wyche, Jr., joined her five minutes later.

According to Garcia's testimony, Wyche attempted to strike up a conversation with her but she was unable to comprehend him. Then, without warning, he grabbed her arm and dragged her down the porch steps and around the apartment house to the back porch of an adjacent abandoned house. He pushed her to the porch floor, removed her clothing, and engaged in sexual intercourse with her.

Garcia managed to convince Wyche to stop by suggesting that it would be better if they moved next door to the comfort of her apartment. Once back at 182 Adelaide Avenue, Garcia began yelling for help and pounding on her landlord's apartment door. The police arrived shortly thereafter. Garcia was then taken to Women and Infants Hospital for an examination and tests.

Prior to trial, Wyche submitted a discovery request to the state asking for, *inter alia*, "[a]ll results or reports in writing, or copies thereof, or physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, and subject to an appropriate protective order under Paragraph (f), any tangible objects still in existence that were the subject of such tests or experiments." The state complied by turning over Garcia's June 19, 1984 hospital records which it had in its possession.

At trial on January 22, 1985, the state called Dr. Donald Guadagnoli, the physician who examined Garcia on June 19, 1984. Doctor Guadagnoli testified that on the morning of June 19 he examined Garcia and administered what is commonly known as a "Rape Kit" battery of tests. His examination revealed no bruises, cuts, tenderness, or other injuries of any kind. Everything, in fact, appeared normal. The doctor also found no trace of acid phosphatase or spermatozoa.

Unbeknownst to Wyche, however, Dr. Guadagnoli, on the eve of his testimony, informed the prosecutor that a blood-alcohol test had also been administered to Garcia on the morning of the nineteenth that indicated a blood-alcohol concentration of .208. The results of the blood test had not been provided to the state by the hospital, nor had the state any knowledge that such a test had been performed prior to the January 21, 1985 conversation with the doctor. Nevertheless, the prosecutor, on January 22, chose not to divulge this newly uncovered evidence to defendant prior to, during, or immediately after Dr. Guadagnoli testified. Rather, the state waited until the jury rendered its verdict before disclosing the test results.

The defendant's motion for new trial based on the prosecutor's failure to disclose the blood-test results was denied by the trial justice on February 28, 1985. On appeal defendant contends that the test results should have been produced either under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny or through Rule 16 of the Superior Court Rules of Criminal Procedure. We agree.

The United States Supreme Court in *Brady* held that a criminal defendant's due-process right to a fair trial is violated whenever, subsequent to an accused's request, the prosecutor intentionally or unintentionally suppresses exculpatory evidence that has a material bearing on questions of guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. The *Brady* doctrine, however, is by no means unlimited in its application. It does not, for example, extend an open invitation to criminal defendants to comb prosecution files for any or all information that might be remotely useful. *United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342, 354 (1976) ("we have

rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel"). Nor is the prosecutor responsible for delivery of information outside his custody and control. *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The prosecutor must disclose the information only if it meets the *Brady* two-part test: that it (1) constitute either exculpatory or impeachment[1] evidence and (2) be material to the outcome of the case or sentencing.

Because the *Brady* decision failed to identify a standard for determining what evidence is "material" under its two-part analysis, it spawned much confusion. In *United States v. Agurs*, the Court attempted to resolve the confusion by applying the *Brady* doctrine to three different situations. First, it concluded that in situations in which a prosecutor knowingly uses perjured testimony or knowingly fails to disclose the falsity of testimony used to convict the defendant, the test of materiality is whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397, 49 L.Ed.2d at 349–50. Second, the Court rejected this reasonable-likelihood standard in favor of a reasonable-doubt standard where the defendant makes no *Brady* request or makes a general request for "all exculpatory evidence" and the prosecutor fails to disclose evidence favorable to the defendant:

> "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be

sufficient to create a reasonable doubt." *Id.* at 112–13, 96 S.Ct. at 2402, 49 L.Ed.2d at 355.

The Court failed to identify the standard of materiality to be applied in situations in which the defendant makes a request for specific exculpatory evidence and the prosecutor fails to respond; the Court did suggest, however, that the standard might be even more lenient to the defendant than when he makes no request or only a general request. *Id.* at 106, 96 S.Ct. at 2398–99, 49 L.Ed.2d at 351.

The questions left in the wake of *Agurs* were put to rest in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), when a majority of the justices on the Court agreed that regardless of whether the defendant makes a general request, specific request, or no request at all, evidence in order to be material must present "a reasonable probability that, had * * * [it] been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at ——, 105 S.Ct. at 3384, 87 L.Ed.2d at 494 (plurality opinion by Blackman, J.).

The state claims that *Bagley*'s standard of materiality controls this case and that defendant fails to meet it. According to the state, no reasonable probability exists to conclude that the outcome would have been different but for the nondisclosure of the test results. From the state's viewpoint, ample evidence of Garcia's drunken condition was presented to the jury by Garcia herself; the blood-test results merely corroborate her testimony. The court finds otherwise.

Prior to the United States Supreme Court's decision in *Bagley*, we established our own criteria for evaluating prosecutorial nondisclosure of exculpatory evidence. *See In re Ouimette*, 115 R.I. 169, 342 A.2d

---

1. In *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972), the United States Supreme Court extended the application of the *Brady* doctrine to impeachment evidence.

250 (1975). While the United States Supreme Court has chosen to tailor its analysis toward the impact of nondisclosure on the trial outcome, we preferred in *Ouimette* to "take as our guidepost" the Second Circuit Court of Appeal's discussion in *United States v. Keogh*, 391 F.2d 138 (2nd Cir. 1968), and adopt a variable standard of materiality based on the degree of prosecutorial culpability. 115 R.I. at 177, 342 A.2d at 254. When the failure to disclose is deliberate, this court will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial. *Id.* The prosecution acts deliberately when it makes "a considered decision to suppress * * * for the purpose of obstructing" or where it fails "to disclose evidence whose high value to the defense could not have escaped * * * [its] attention." *Keogh*, 391 F.2d at 146–47.

■ The prosecutor's conduct in this case was unquestionably deliberate. Despite learning of the existence of the test results from Dr. Guadagnoli on the evening before the doctor's testimony, the prosecutor elected not to reveal this finding until after the jury rendered its guilty verdict. He questioned the doctor at length, eliciting an abundance of irrelevant facts about the victim's physical condition. Surprisingly, no mention of her blood-alcohol-concentration reading was ever made. The extremely high reading of alcohol in Garcia's blood, coupled with the impact that such scientific evidence has on juries, was certainly evidence of such "high value" to Wyche that it could not have eluded the prosecutor. Given the strength of the facts in this case, even were we to apply the *Bagley* reasonable-probability standard of materiality, defendant would be entitled to a new trial.

Nondisclosure of the blood-alcohol-test results also violated Rule 16 of the Superior Court Rules of Criminal Procedure. Rhode Island's Rule 16 is designed to prevent surprises to both parties by requiring extensive pretrial disclosure of facts.

*State v. Adams*, 481 A.2d 718 (R.I.1984). The scope of our Rule 16 makes it one of the most liberal criminal discovery mechanisms in the United States. *State v. Coelho*, 454 A.2d 241 (R.I.1983). In pertinent part Rule 16 states:

"Discovery and inspection.—(a) Discovery by Defendant. Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following *items within the possession, custody, or control of the State*, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

\*    \*    \*    \*    \*    \*

(5) all results or reports *in writing*, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case and, subject to an appropriate protective order under paragraph (f), any tangible objects still in existence that were the subject of such tests or experiments." (Emphasis added.)

The state exhorts the court to adhere to the literal reading of the rule and require the prosecution to deliver only reports and results that are (1) known by the state to be in existence, (2) within the state's custody and control, and (3) in writing. Because the prosecutor had no written report or results about the victim's blood-alcohol test within his possession, the state argues he had no Rule 16 duty to disclose the .208 reading. We decline to limit Rule 16(a)(5) in this fashion.

■ There is no disputing that a blood-alcohol test was performed June 19, 1984 on Garcia and that it indicated a .208 concentration. In all likelihood some type of written report or record of the test was made in the normal course of hospital procedure. What became of that report is not of concern here. The key factor for this court is the state's knowledge that the .208 reading existed and that the state pos-

sessed this information prior to the doctor's taking the witness stand. Knowledge plus possession of the results in oral form was sufficient in our belief to trigger disclosure under Rule 16(a)(5). To require the prosecution to produce written but not oral test results in its possession invites abuse.

Rule 16(i) provides for an array of sanctions when the parties fail to comply with the rule. The decision to impose sanctions is left to the sound discretion of the trial justice and should not be overturned absent clear abuse. *State v. Coelho*, 454 A.2d at 245; *State v. Darcy*, 442 A.2d 900, 902 (R.I.1982). In selecting an appropriate sanction for a discovery violation, we said in *Coelho* that the trial justice and this court on appeal should consider "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." 454 A.2d at 245. Where nondisclosure is deliberate, the defendant is entitled to a new trial and this court will not inquire into the presence of the other factors. *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983).

The court's decision today makes clear that questions involving deliberate discovery violations under either *Ouimette* or Rule 16 shall be governed by the same standards.

The defendant's appeal is sustained, the judgment below is vacated, and the case is remanded to the Superior Court for a new trial.