STATE

v.

Joseph E. McMANUS Jr.

No. 98–141–C.A.

Supreme Court of Rhode Island.

Feb. 21, 2008.

Christopher R. Bush, Esq., for Plaintiff.

Joseph E. McManus Jr., pro se.

Susan M. Iannitelli, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

This is a heinous and horrific case of domestic abuse that resulted in the execution-style murder of a wife and beloved mother of three children. Our decision today marks the first time that this Court has had the opportunity to consider and uphold a sentence of life imprisonment without the possibility of parole for a crime of domestic violence occurring between a husband and wife.

In the early morning hours of June 29, 1996, Kelly McGinity McManus (Kelly), was stabbed six times with an eleven-inch kitchen knife in her own home, in Bonnet Shores, Narragansett. In one of the incisions, the knife entered her left breast, pierced the lower lobe of her right lung, and penetrated the right ventricle of her heart, resulting in her death. For a period in excess of twelve-minutes, Kelly endured excruciating pain and terror that was the culmination of physical and mental abuse inflicted by her husband that had been

ongoing for years. Within an hour of her fatal stabbing, police located Kelly's husband, defendant, Joseph E. McManus Jr. (defendant), at the Bonnet Shores Beach Club (BSBC), where he was attempting suicide. A grand jury subsequently indicted defendant on one count of murder for his wife's death.

The defendant did not dispute having fatally stabbed his wife, but instead advanced a diminished-capacity defense at trial. After an eight-day trial, a jury convicted defendant of one count of first-degree murder. The jury further concluded that defendant murdered his wife in a manner involving torture and aggravated battery. The trial justice agreed and sentenced defendant to life without parole. On appeal, defendant raises multiple arguments of error. For the reasons set forth herein, we affirm defendant's conviction.

# I

## Facts and Travel

In June 1996, defendant and Kelly had spent about twenty years together and had been married for four years. They were the biological parents of Jennifer McGinity (Jennifer), Joseph McGinity (Joseph), and Karen McGinity (Karen).

According to the testimony of their children and their close friends, the couple's marriage began to deteriorate months before Kelly's death. During this time, defendant and Kelly argued constantly and, at times, their verbal fights turned physical, with defendant assaulting Kelly. Their friends and children testified that the couple's fighting worsened, in large part because of defendant's growing belief that his wife was having an affair with one Keith Knapton, a man who played on defendant's softball team.

Beginning in March 1996, Kelly relied on friends to help protect her from defen-

dant's abuse. Joyce Petrocelli, a longtime friend of the McManuses, testified about a telephone call she received that month. According to Petrocelli, Kelly was "crying, sobbing and kind of hysterical." When Petrocelli arrived at the McManus home she could hear defendant yelling "you f* * * * * * * b* * * *;" and, when she entered the house, she saw Kelly kneeling on the floor with her hands over her head and crying, as defendant stood over her. Petrocelli testified that she confronted defendant about assaulting Kelly. When defendant denied this allegation, Jennifer spoke up to confirm Petrocelli's allegation. The defendant, outraged that Jennifer was telling Petrocelli the family's "personal business," finally admitted to Petrocelli that "maybe [he] pushed her."

Ronda Sankey VanWormer (Ronda), who considered Kelly her "best friend," also testified about defendant's erratic behavior on several occasions before Kelly's death. Ronda described one evening in May when she and Kelly picked up defendant at a local restaurant. After getting into Ronda's car, defendant, who was noticeably drunk, began yelling and screaming at Kelly. Ronda testified that he pulled Kelly's hair, slapped her face, and screamed "when [I] tell [you] to f* * * * *' do something, [you'd] better do it and if [I] had a gun, [I] would f* * * * *' kill you."

Ronda also testified about defendant's suspicions that his wife was having an affair with Knapton. On one occasion, Ronda noticed that defendant was sitting in his parked truck outside the convenience store where Kelly worked. When Ronda approached defendant to say hello, he informed her that he was sitting in the parking lot to see how many times Knapton would go inside the store. He told Ronda that "if [Kelly] was screwing around on him, he would f* * * * *' kill

her." On another occasion, defendant told Ronda and Ronda's husband, Timothy VanWormer (Timothy), that he had gone to Knapton's workplace to find out whether Knapton was sleeping with Kelly.

Timothy also testified about defendant's suspicions of Kelly's infidelity. Timothy, who described defendant as "practically [his] best friend," testified that during the month before Kelly's death, defendant repeatedly threatened that "if he ever found out that [Kelly] was going to leave him or cheated on him he was going to kill her and kill himself."

As defendant's suspicions intensified, he confided in other friends, including his business partner and close friend Dean Jordan. In the weeks before Kelly's death, defendant told Jordan that "if he ever caught her with anyone else, he would kill that person, kill her and kill himself." Andrew Northup, who had known defendant for six or seven years, likewise testified that defendant threatened to kill Kelly if he caught her cheating on him.

After months of enduring defendant's abuse, Kelly on June 28, 1996, finally asked her husband to leave the family's home. During an argument between the two, Joseph heard his father accuse his mother of being unfaithful and heard him call her a "slut" and a "whore." After pleading with Kelly to allow him to stay, defendant packed some of his belongings in a laundry basket and left the house. That evening, after having drinks at several local taverns, defendant told his softball teammate, Christopher Coppa, "if I can't have her, nobody is going to have her" and "if I can't have her, I will kill her."

Shortly after 5 a.m. on June 29, 1996, Kelly's fourteen-year-old son, Joseph, and sixteen-year-old daughter, Jennifer, arose out of bed after hearing the sound of their father, defendant, attempting to get into their family's home. The teenagers could hear their father pleading with their mother to allow him back into the house and begging her to take him back. As their father's voice and footsteps drew closer, the teenagers realized that their father had found a way into the house. The defendant continued to plead with his wife, asking her to sit down and talk to him. Kelly, who was on her way to work, told defendant that they could talk after her shift but that she had to get going or she would be late. Dissatisfied with this answer, defendant retorted, "[i]f you leave this house, you are dead." While still pleading with his wife for permission to stay in the house again, defendant disconnected both household telephones, telling her "now you can't call anybody if anything happens."

Jennifer watched as her father grabbed her mother from the bedroom doorway and tossed her into the living room. Upon seeing this, Jennifer got out of bed, yelled upstairs to her brother, and ran out of the house. Joseph, still upstairs in his bedroom, could hear someone being thrown to the floor and his mother crying. He went downstairs to try to help his mother, but before he reached the bottom step, he looked over the railing and made eye contact with his father, who was stabbing his mother. Joseph picked up a rock on the staircase, ran down the remaining steps, and threw it at his father. Despite Joseph's efforts, defendant continued to stab Kelly. Attempting once more to stop his father, Joseph picked up a coffee table and broke it over his father's head. Finally, defendant stopped, walked to the front door, and left the house.

Jennifer, still outside in the yard, saw her father leave and went back inside the house, where she found her mother kneeling on the floor, pleading for her children's help. Jennifer and Joseph had difficulty calling 911 because their father had discon-

nected the phones, but they finally were able to get a dial tone and called for help.

When Narragansett Police Officer John Maher received a call from dispatch that morning, he headed toward King Phillip Road, where he spotted Joseph at the top of the street, waving him down and pleading with him to "hurry up." Inside the home he saw Kelly lying on the floor. She was not responsive. Jennifer, who was cradling her mother's head in her lap, told Officer Maher that her father had stabbed her mother and that he probably was at the BSBC attempting to commit suicide.

Lieutenant Byron Cahoone of the Narragansett Fire Department also responded to the McManus home and discovered that Kelly was not breathing. Despite his efforts to resuscitate her, Kelly remained unresponsive. She was taken to South County Hospital, where she was pronounced dead.

As Jennifer suspected, after leaving the house, defendant went to the BSBC, where he was employed as a maintenance manager. At approximately 5:30 a.m., Dwight Kallinich, a security guard at the BSBC, spotted defendant at the club; defendant was bleeding from one wrist. When Kallinich approached defendant to offer his help, defendant refused, telling his coworker: "[J]ust let me die, I just want to die." Actually, defendant was bleeding from both wrists.

Kallinich ignored defendant's request and proceeded to get paper towels from the nearby men's room to wrap around defendant's wrists. The defendant again refused Kallinich's help, but finally agreed to sit down. The defendant continued pleading with Kallinich not to call for help, but Kallinich was able to lock himself in an office, where he called 911. While Kallinich was calling for help, he observed,

from the office window, defendant walk down the boardwalk toward the ocean.

When Narragansett Police Officer Rock Girard arrived at the BSBC, he observed defendant walking back and forth in the surf. His wrists were badly severed, and he was talking to himself. Officer Girard heard him say, "I am sorry. I am sorry." He repeatedly said that he was sorry and that he did not care about himself but was "just worried about [his] wife."

Narragansett Police Officer Michael Dugan also responded to the BSBC. When he met with Officer Girard and defendant at the club, he advised defendant of his *Miranda*[1] rights and patted him down.

An ambulance soon arrived to treat defendant for the wounds to his wrists. While defendant was being treated by an emergency medical technician, Officer Dugan looked inside a nearby maintenance shed, where he saw a large amount of blood on the ground and a utility knife sticking upright in the sandy floor of the shed. Officer Dugan returned to the ambulance, read defendant his *Miranda* rights once again, and proceeded to ask him whether he used the utility knife to cut his wrists. The defendant said he did. Officer Dugan then asked defendant where the other knife was. To this, defendant replied, "I think it is back at the house, but I am not sure." The defendant then was transported to South County Hospital for treatment and, three hours later, he was transported to Rhode Island Hospital for additional treatment.

On September 6, 1996, a Washington County grand jury indicted defendant on one count of murder for Kelly's death and, after trial, a jury convicted defendant of first-degree murder. The jury also found that defendant murdered Kelly in a manner involving torture and aggravated bat-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

tery. The defendant was sentenced to life imprisonment without the possibility of parole.

## II

## Analysis

On appeal, defendant raises five distinct arguments for this Court's review. First, defendant contends that he is entitled to a new trial because the state deliberately failed to provide him with two statements in discovery. Second, defendant argues that the trial court erred in denying his motion to disqualify one of two prosecutors who tried the case. Third, defendant contends that he is entitled to a new trial because one of his two attorneys had a conflict of interest with one of the prosecutors. Finally, defendant argues that the Superior Court erred in denying his request for a mistrial. In addition, defendant's standby appellate counsel, through a supplemental brief filed on defendant's behalf, argues that a sentence of life imprisonment without the possibility of parole is unwarranted in this case.

## A

## New Trial

The defendant's *pro se* brief first asserts that the state's failure to provide him with the transcript of an interview with Knapton violated Rule 16 of the Superior Court Rules of Criminal Procedure as well as due process principles recognized by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). These violations, de-

fendant asserts, entitle him to a new trial.[2] The factual background upon which defendant relies to support his arguments is as follows.

Days after defendant was indicted by a grand jury, he filed a motion for discovery pursuant to Rule 16. The state responded to defendant's request, identifying Knapton as a witness and including copies of a statement that Knapton provided to the state one month before. In the statement provided to defendant, Knapton detailed his relationship with Kelly, and said that he was "having an affair sexually" with her. The state also provided defendant with copies of letters Knapton wrote to a state prosecutor.

While defendant was incarcerated and awaiting trial for the death of his wife, law enforcement officials received confidential information from a prison inmate who reported that defendant was soliciting the murder or assault of Knapton. Law enforcement officials began an investigation into the alleged solicitation and learned that defendant also had solicited the murder of the then attorney general and a state prosecutor. As part of this investigation, law enforcement officials interviewed Knapton, at which time he discussed his relationship with Kelly.

One month after defendant was convicted of the first-degree murder of his wife, a grand jury also indicted defendant on two counts of soliciting an inmate to commit murder, one count of soliciting an inmate to commit murder or assault, one count of

---

**2.** The defendant also contends, for the first time on appeal, that the state failed to disclose a statement made by Robert Smith, an inmate at the Adult Correctional Institutions, to the Rhode Island State Police. We need not address this issue, however, because "our well-established raise-or-waive rule precludes this Court from addressing arguments raised on appeal that first were not presented to the

trial justice for review." *State v. Lyons*, 924 A.2d 756, 764 (R.I.2007) (citing *State v. Mohapatra*, 880 A.2d 802, 810 (R.I.2005)). To the extent that defendant's *pro se* brief alleges that a variety of other occurrences entitle him to a new trial, we conclude such claims are not legally cognizable. Accordingly, we will not address these meritless arguments. *See State v. Briggs*, 886 A.2d 735, 761 (R.I.2005).

threatening a public official with death, and one count of threatening a public official with bodily harm. In connection with that case, defendant filed a request for discovery, and the state, in response, provided defendant with a transcript of the interview with Knapton.

With the transcript of Knapton's interview finally in his possession, defendant moved for a new trial in this case, alleging that he was "denied due process as a result of prosecutorial misconduct of suppressed favorable evidence." Although defendant's motion and a later-filed memorandum of law to support his motion for a new trial are rather ambiguous, defendant appeared to assert initially that he is entitled to a new trial based on newly discovered evidence and alleged violations of the rules of discovery and due process principles enunciated in *Brady*. A supplemental brief, however, filed on defendant's behalf by his then attorney, withdrew his argument with respect to newly discovered evidence. Therefore, the only arguments remaining for this Court to consider is whether the state's failure to provide him with the transcript of Knapton's interview was a violation of Rule 16 or the due-process principles recognized by *Brady*. These violations, defendant asserts, entitle him to a new trial.

■ When reviewing a trial justice's decision with respect to whether a violation of Rule 16 or *Brady* occurred, this Court affords great deference to the trial justice and will not disturb that ruling unless he or she has committed clear error. *State v. Briggs*, 886 A.2d 735, 755 (R.I.2005) (citing *State v. Rice*, 755 A.2d 137, 151 (R.I.2000)). We long have recognized that "the trial justice is in the best position to determine whether any harm resulted from noncompliance with discovery motions * * *." *State v. Brisson*, 619 A.2d 1099, 1102 (R.I.

1993) (quoting *State v. Coelho*, 454 A.2d 241, 244–45 (R.I.1982)).

■ This Court often has explained that the "overarching purpose of Rule 16 is 'to ensure that criminal trials are fundamentally fair.' " *Briggs*, 886 A.2d at 754 (quoting *State v. Gordon*, 880 A.2d 825, 832 (R.I.2005)). Therefore, the rule, which is aimed at eliminating surprise at trial, seeks "to ensure that both parties receive the fullest possible presentation of facts prior to trial." *State v. Garcia*, 643 A.2d 180, 186 (R.I.1994) (quoting *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983)). To achieve this goal, Rule 16(a)(8) obligates the state to provide all written and recorded verbatim statements, signed or unsigned, of those people the state expects to call as witnesses.

■ Failure to comply with this obligation can subject a party to a variety of sanctions, provided for in Rule 16(j). To determine the appropriate sanction, a trial justice will consider "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *Brisson*, 619 A.2d at 1102 (quoting *Coelho*, 454 A.2d at 244–45). If, however, the state deliberately failed to disclose evidence, "the defendant is entitled to a new trial, and no inquiry is needed into the presence of the other three factors." *State v. Stravato*, 935 A.2d 948, 951 (R.I.2007) (citing *State v. Wyche*, 518 A.2d 907, 911 (R.I. 1986)).

■ In addition to our liberal discovery rules, *Garcia*, 643 A.2d at 186, the due process clause of the United States Constitution requires that the state provide a criminal defendant with certain information. *See Brady*, 373 U.S. at 87, 83 S.Ct. 1194. In accordance with *Brady*, if a prosecutor has suppressed evidence that would

be favorable to the accused and the evidence is material to guilt or punishment, the defendant's due-process rights have been violated and a new trial must be granted. *See Briggs,* 886 A.2d at 755 (citing *Cronan ex rel. State v. Cronan,* 774 A.2d 866, 880 (R.I.2001) and *Brady,* 373 U.S. at 87, 83 S.Ct. 1194).

■ To satisfy the degree of materiality necessary to establish a *Brady* violation, "a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Cronan,* 774 A.2d at 880 (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Materiality need not be demonstrated, however, if the prosecution deliberately suppresses evidence. We have held that "[t]he prosecution acts deliberately when it makes 'a considered decision to suppress * * *' or where it fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.'" *Wyche,* 518 A.2d at 910 (quoting *United States v. Keogh,* 391 F.2d 138, 146–47 (2d Cir.1968)).

■ In the case of an inadvertent nondisclosure, however, *Brady* is not implicated. Therefore, we need consider only whether there was procedural prejudice to the opposing party. *Brisson,* 619 A.2d at 1103. We have said that "[p]rocedural prejudice occurs when defense counsel must proceed to trial unprepared." *Id.* (quoting *Concannon,* 457 A.2d at 1354). To demonstrate such procedural prejudice, a defendant "must show there is a significant chance that the use and development of the withheld evidence by skilled counsel at trial would have produced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id.* (quoting *State v. Burke,* 574 A.2d 1217, 1226 (R.I.1990)). Nevertheless, evidence is not considered

suppressed and, therefore, a new trial is not necessary if the defendant knew or should have known of the essential facts permitting him to take advantage of that evidence. *See Ellsworth v. Warden, New Hampshire State Prison,* 333 F.3d 1, 6 (1st Cir.2003) (citing *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982)); *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993); *United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991); *United States v. Pandozzi,* 878 F.2d 1526, 1530 (1st Cir. 1989).

■ With these standards in mind, the trial justice concluded that defendant had not made the requisite showing of a *Brady* violation or a Rule 16 violation warranting a new trial. In her opinion, "[t]he statements contained within the Knapton statement are not of obvious high value to the defense * * * [and] therefore, are not of the type that could be characterized as deliberately withheld."

The trial justice's review of the transcript, made during the investigation of the alleged criminal solicitation revealed that it contained Knapton's description of his relationship with defendant, defendant's relationship with Kelly, and defendant's state of mind just before Kelly's death. With this in mind, the trial justice concluded that "[t]he defendant himself knew of the essential facts contained in the statement which would have permitted him to take advantage of that evidence." She further concluded that even if there were statements in the transcript that defendant was not aware of before trial, defendant certainly knew whether Knapton could assist him with his defense. It was accordingly her view that defendant's failure to either interview Knapton or call him as a witness was solely his strategy decision. We agree.

This Court has defined a deliberate nondisclosure as " 'a considered decision to suppress * * * for the purpose of obstructing' or where [the prosecution] fails 'to disclose evidence whose high value to the defense could not have escaped * * * [its] attention.' " *Stravato*, 935 A.2d at 953 (quoting *Wyche*, 518 A.2d at 910).

The record in this case is devoid of any indication that the state deliberately failed to provide a copy of the transcript of the interview with Knapton to defendant. Moreover, it is not even clear from the record that the prosecutor was in possession of the transcript at the time of defendant's murder trial. Nor is the transcript the type of evidence " 'whose high value to the defense could not have escaped * * * [its] attention.' " *Stravato*, 935 A.2d at 953 (quoting *Wyche*, 518 A.2d at 910).

Last term this Court was presented with a case involving the state's deliberate nondisclosure of a victim-impact statement. *Stravato*, 935 A.2d at 955. In that case, this Court was particularly concerned that the state was "evad[ing] the clear command of Rule 16 by its own subjective assessment of the evidence." *Stravato*, 935 A.2d at 955. We noted that "the state cannot evade a proper Rule 16 discovery request by providing defendant with similar information found in other sources." *Stravato*, 935 A.2d at 955.

Unlike that case, however, we are unable to conclude that the state's nondisclosure was deliberate here. There is no indication that the state was attempting to avoid disclosing the transcript by instead providing defendant with other statements containing the same information. Indeed, all the information that defendant contends was withheld from him was information that he was well aware of, and he was in no way prejudiced by proceeding to trial without a copy of the transcript in hand. Furthermore, we fail to see how the infor-

mation contained in the transcript would have been useful at all to defendant's case or his diminished-capacity defense. Although defendant contends that he would have used some of this information to develop a heat-of-passion defense at trial, he never pursued such a defense, even though he possessed sufficient evidence of Kelly's relationship with Knapton from other sources.

We thus conclude that the trial justice did not commit any error in denying defendant's motion for a new trial.

## B

### Disqualification of Prosecutor

The defendant next argues that the trial justice erred by denying his motion to disqualify one of the two prosecutors assigned to his case. The defendant's primary contention in this respect is that the prosecutor had a personal interest in seeing him convicted because he allegedly had solicited her murder or bodily harm.

The decision of whether or not to disqualify a prosecutor is within the sole discretion of the trial justice. *Harker v. Commissioner of Internal Revenue*, 82 F.3d 806, 808 (8th Cir.1996); *People v. Hamilton*, 46 Cal.3d 123, 249 Cal.Rptr. 320, 756 P.2d 1348, 1356 (1988). A trial justice's decision on a motion to disqualify a prosecutor, therefore, is reviewed for an abuse of discretion. *United States v. Bolton*, 905 F.2d 319, 321 (10th Cir.1990); *Hamilton*, 249 Cal.Rptr. 320, 756 P.2d at 1356.

Although we never before have had an opportunity to address this precise question of law, we are persuaded, as was the trial justice, that the prosecutor's disqualification was unnecessary in this case. Courts that have considered this issue typically hold that a prosecutor should be

disqualified if there is an actual conflict of interest. *See, e.g., Jorgensen v. State,* 567 N.E.2d 113, 123 (Ind.Ct.App.1991); *Kindred v. State,* 521 N.E.2d 320, 327 (Ind. 1988); *see also Summit v. Mudd,* 679 S.W.2d 225, 226 (Ky.1984). For example, this Court has held that an actual conflict would exist if the prosecutor is a necessary witness in the case against the defendant. *See State v. Usenia,* 599 A.2d 1026, 1030 (R.I.1991).

An Indiana court, presented with facts that are strikingly similar to those in the instant matter, held that a prosecutor's participation in a case in which the defendant had threatened the prosecutor's life was not a conflict of interest. *See Kindred,* 521 N.E.2d at 327. In so holding, the court was persuaded that "to allow prosecutors to be disqualified merely upon the unilateral action of defendants * * * would lead to absurd consequences." *Id.*

A federal district court likewise has dealt with this problem. *Resnover v. Pearson,* 754 F.Supp. 1374, 1388 (N.D.Ind. 1991). "Unfortunately in the society in which we now live, it is all too commonplace that judges, prosecutors, and lawyers are threatened and their lives are in danger. * * * It is a matter of common knowledge that United States district judges, United States attorneys, state judges and state prosecutors are often threatened and require protection from threats." *Id.* Nevertheless, the court concluded that there was not "a shred of authority" to support any conclusion that a defendant who threatens to kill a prosecutor has a constitutional right to have the prosecutor disqualified from the case. *Id.* Rather, it held that "[t]he law is clear that a party, including a defendant in a criminal case, cannot drive a state trial judge off the bench in a case by threatening him or her. It is likewise true that a criminal defendant cannot cause the recusal of his

prosecutor by threatening the prosecutor or having him threatened." *Id.* at 1388–89.

We share these sentiments. Requiring the prosecutor in the instant case to be disqualified merely because defendant allegedly threatened her life would provide an incentive for defendants to engage in such unlawful conduct. We cannot sanction such a strategy in the courts of this state, and we disagree with those cases that hold otherwise. *See, e.g., Millsap v. Superior Court,* 70 Cal.App.4th 196, 82 Cal.Rptr.2d 733, 738 (1999) (concluding that there was a "real potential for actual prejudice" if the prosecutors who were the target of the defendant's alleged murder solicitation were allowed to prosecute his case); *State v. Hottle,* 197 W.Va. 529, 476 S.E.2d 200, 212 (1996) (requiring the disqualification of a prosecutor when the prosecuting attorney or his or her family are among the intended victims).

With these principles in mind, we are unable to conclude that it was an error for the trial justice to deny defendant's motion to disqualify the prosecutor assigned to this case.

## C

### Defense Counsel's Purported Conflict of Interest with the Prosecutor

■ The defendant also argues on appeal that his trial attorney, a public defender, had a conflict of interest with the prosecutor, which prevented defendant from receiving fair representation. As support for his allegation, defendant directs our attention to a letter in which the public defender expressed his respect for the prosecutor, whom he acknowledged once was his colleague in the public defender's office.

For its part, the state argues that defendant's argument is not ripe for review.

According to the state, defendant's argument, when distilled to its essence, is that he has been deprived of his Sixth Amendment right to the effective assistance of counsel. As such, the state contends, that this argument may be raised only in a postconviction-relief proceeding and not on direct appeal to this Court. We agree that defendant is alleging that he was denied his Sixth Amendment right to the effective assistance of counsel.

■ It is well established in this jurisdiction that allegations of ineffective assistance of counsel are "more properly cognizable in post-conviction proceedings." *State v. Gonsalves,* 476 A.2d 108, 112 (R.I. 1984) (quoting *State v. Levitt,* 118 R.I. 32, 39, 371 A.2d 596, 600 (1977)). In the occasional case, this Court will entertain an allegation of ineffective assistance of counsel, but only when those allegations are "based on specific rulings by the trial justice * * * because such action is 'consistent with the fundamental principle that only specific rulings of a trial justice are reviewable on direct appeal.'" *Id.* (quoting *Levitt,* 118 R.I. at 40, 371 A.2d at 600). Nevertheless, this exception does not apply to the facts of this case because defendant does not appeal from a ruling of the trial justice, but rather, raises this issue for the first time on appeal. Therefore, this Court declines to consider defendant's allegation of ineffective assistance of counsel on direct review.

### D

### Motion to Pass the Case

The defendant next argues that the trial justice erred when she declined to grant a mistrial after the state posed an objectionable question to Narragansett Police Officer Kimberly Higgins.

Officer Higgins testified that she responded to the BSBC, where defendant had attempted suicide. Officer Higgins was assigned to escort the ambulances that took defendant first to South County Hospital and then to Rhode Island Hospital. The questions directed to Officer Higgins at trial, therefore, focused on her observations of defendant while in his company at both hospitals. She testified that defendant informed the nurses that he had consumed six to ten beers. Hospital tests revealed that defendant had a blood alcohol level of 0.131. Although defendant had denied any drug use, hospital tests also revealed the presence of cocaine in his system.

On cross-examination, defense counsel inquired about Officer Higgins's familiarity with Rhode Island laws governing the operation of a motor vehicle while under the influence of alcohol and her knowledge about the legal blood-alcohol level, which, at the time, was 0.10.

On redirect examination, the state inquired further about Officer Higgins's experience with intoxicated people and her knowledge of Rhode Island laws governing the operation of a motor vehicle while under the influence of alcohol. These questions were followed by the state's question: "Do you know of any law in the State of Rhode Island that says if you have a blood alcohol level above .10, you can't go out and kill somebody?" The trial justice sustained defendant's immediate objection and ordered that the question be "stricken and disregarded." The defendant requested a bench conference, and moved to pass the case. Although the trial justice agreed that the question was "inappropriate," she denied defendant's motion, concluding that it was not "so inappropriate or prejudicial as to taint [the] jury." The trial justice also offered to give a curative instruction and informed the jury that

"the question of the defendant's level of intoxication, if any and how that level of

intoxication affected his state of mind, if, if at all, will be for you to determine ultimately in accordance with the instructions I will give you on of [*sic*] the law at the conclusion of the case."

■■■ "[A] motion to pass a case is viewed for all intents and purposes as identical to a motion for a mistrial." *State v. Mendoza*, 889 A.2d 153, 158 (R.I.2005) (quoting *State v. Disla*, 874 A.2d 190, 198 (R.I.2005)). "[I]t is well-settled law that motions to pass a case and declare a mistrial are matters left to the sound discretion of the trial justice." *Id.* (quoting *State v. Oliveira*, 774 A.2d 893, 912 (R.I. 2001)). Indeed, we have explained that "[t]he reason we vouchsafe such broad power in the trial justice in this regard is 'that he or she possesses a "front-row seat" at the trial and can best determine the effect of the improvident remarks upon the jury.'" *Id.* Therefore, we will not disturb a trial justice's ruling unless it clearly is wrong. *Oliveira*, 774 A.2d at 912 (citing *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996)).

■■■ The defendant argues that the trial justice was clearly wrong by denying his motion to pass the case and that this Court should consider not only the impropriety of the state's question but also consider it in light of the numerous instances of alleged prosecutorial misconduct that occurred at trial. We find defendant's argument in this respect unpersuasive and unsubstantiated. The defendant makes broad allegations about the prosecutor's ethical conduct at trial without offering any persuasive support.

Affording the trial justice the deference she is due, we conclude that she did not err in denying defendant's motion. During his cross-examination of Officer Higgins, defendant's counsel already had opened the door to questions about Rhode Island laws governing the operation of a motor vehicle while under the influence of alcohol. Although the state's question on redirect was improper, we cannot conclude that the jury would be so affected by the question "that they would not be able to decide the case based on a dispassionate evaluation of the evidence." *State v. Lynch*, 854 A.2d 1022, 1034 (R.I.2004). The trial justice's curative instruction was more than sufficient to dissipate any taint from the state's improper question.

**E**

**Life without the Possibility of Parole**

Although defendant represented himself on appeal, he poses a final argument to this Court through his standby counsel. The defendant argues that the imposition of a life sentence without the possibility of parole was unwarranted in this case and urges this Court to reduce his sentence to life with the possibility of parole.

■■■ As a threshold matter, "a sentence of life imprisonment without the possibility of parole may be imposed in a first-degree murder case when one of seven enumerated grounds is present." *State v. Motyka*, 893 A.2d 267, 288 (R.I.2006) (citing *State v. Pacheco*, 763 A.2d 971, 982 (R.I.2001)). One such enumerated aggravating circumstance exists when murder in the first degree was committed in a manner involving torture or an aggravated battery to the victim, and the trial justice, after considering the factors set forth in G.L.1956 chapter 19.2 of title 12, concludes that such a penalty is warranted. G.L. 1956 § 11-23-2.

On July 2, 1997, the jury returned a verdict finding defendant guilty of the first-degree murder of his wife, Kelly. The next day, the trial justice instructed the jury to decide whether defendant's murder of Kelly involved torture or an

aggravated battery. Although the court may impose a sentence of life imprisonment without the possibility of parole based on a finding that one of these two circumstances was present, the jury found beyond a reasonable doubt that both of the circumstances were present.

After the jury makes such a finding, the trial justice then exercises his or her discretion to determine whether a sentence of life imprisonment without parole is warranted. In so doing, the trial justice must consider "evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination." Section 12–19.2–4.

After hearing the arguments of counsel at sentencing and considering the nature of defendant's conduct, the trial justice articulated the following findings in her eloquent sentencing, which covers twenty-six pages of the transcript. With respect to aggravated battery, the trial justice found

> "The facts surrounding the stabbing episode clearly establish that the defendant intentionally and maliciously inflicted traumatic force upon [Kelly] by stabbing her multiple times with a knife. The stabbing not only deprived [Kelly] of several vital organs and rendered those organs useless and disfigured, in connection with her fatal wound, it also disabled her arm and disfigured it and her back with five nonfatal wounds. All of the stabbings occurred while [Kelly] was alive and conscious and screaming."

She further found, with respect to torture,

> "Joseph McManus, you were not satisfied with killing alone. You tormented [Kelly]. Stabbed her painfully and repeatedly without killing her swiftly and instantly, and then left her while she

was still alive and conscious, in need of help, dying in the arms of her children, to punish [Kelly] and to execute vengeance upon her. You wanted simply not to end her life but to make sure she [knew] in the end that you alone controlled her destiny, your own destiny and that of the family. This stabbing episode was, indeed, extraordinary."

Based on the evidence and, in particular, the mental abuse that defendant inflicted upon Kelly while she was conscious, the trial justice was satisfied that defendant's crime involved both torture and aggravated battery. On appeal, defendant argues that a sentence of life imprisonment without the possibility of parole is not warranted in this case.

When a defendant contests the imposition of a sentence of life without the possibility of parole, "this Court * * * exercise[s] its own independent judgment and discretion in determining the appropriateness of the sentence." *State v. Quinlan*, 921 A.2d 96, 111 (R.I.2007) (quoting *State v. Tassone*, 749 A.2d 1112, 1119 (R.I.2000)). In conducting our *de novo* review of the sentence, "we must don the robes of a trial justice," *State v. Washington*, 581 A.2d 1031, 1035 (R.I.1990), and "look to the record, the jury's findings, the trial justice's conclusions, and the character and propensities of the defendant, including any aggravating circumstances as well as any mitigating factors." *Quinlan*, 921 A.2d at 111–12 (citing § 12–19.2–4; *Motyka*, 893 A.2d at 290).

Because this Court has a duty to embark on a thorough, independent review of the record to determine whether a defendant's conduct rises to the level of torture or aggravated battery, we again will detail the salient facts to make it perfectly clear which facts we rely on to support our conclusion that a sentence to life imprison-

ment without the possibility of parole is appropriate in this case.

■ The record reflects that, in the weeks leading up to Kelly's death, defendant made threatening comments in the presence of many of his friends and acquaintances, repeatedly indicating his intention to kill his wife. Witness after witness testified at trial that defendant had told them that he would kill Kelly if he ever found out that she cheated on him. It was not long before defendant's threats materialized. On June 29, 1996, defendant brutalized Kelly for a period in excess of twelve minutes during this savage murder. That morning defendant stood outside the McManus home begging for permission to come inside. When Kelly did not comply with defendant's demands, defendant broke into the house and threatened to kill her if she walked out the door. In what can be viewed only as an attempt to exacerbate her fear, defendant disconnected both household telephones, telling Kelly, "now you can't call anybody if anything happens."

With two of the couple's three children within earshot, defendant grabbed Kelly by her shoulders and tossed her from her bedroom into the adjacent living room, where he proceeded to stab her repeatedly with an eleven-inch kitchen knife as Kelly laid crouched in a fetal position on the floor. Hearing his mother's screams, Joseph went downstairs, where he witnessed his father repeatedly stabbing his mother in an "up and down" fashion as she lay in this vulnerable and defenseless position. The defendant finally stopped only after Joseph threw a coffee table at him, leaving it forever a mystery how many times he would have stabbed his wife had his efforts not been halted. With that, defendant stood up and walked out the front door, leaving his wife to die. Beside her lay a severely bent eleven-inch kitchen knife. Throughout this time, and for three to four minutes after the stabbing, Kelly remained conscious, screaming so loudly that she woke the neighbors. Adding further to her suffering, Kelly knew during this time that she was about to die. As Kelly's daughter cradled her mother's head in her lap waiting for help to arrive, she pleaded, "help me, I am dying." Even after defendant had fled from the family's house, he thwarted the children's ability to call for help because he had disconnected the home phones.

In *State v. Travis*, 568 A.2d 316 (R.I. 1990), this Court explained that the terms torture and aggravated battery are words of common usage. The term "aggravated battery" would "convey to a juror of ordinary intelligence an image of a beating or infliction of traumatic force that is greater than necessary in order to render a victim helpless or to subject the victim to the will of the aggressor." *Id.* at 323.

The evidence overwhelmingly supports the conclusion that defendant murdered Kelly in a manner involving aggravated battery. The defendant repeatedly stabbed his wife as she lay crouched in a fetal position on the floor, vulnerable and defenseless. The defendant continued to stab Kelly even after rendering her helpless and subjecting her to his will. It is without question that this brutal slaying falls precisely within the definition of aggravated battery.

Since we have concluded that the record contains a more than adequate basis for a finding of aggravated battery, we need not and do not reach the issue of torture.[3] Nevertheless, we pause to note with dis-

___

3. The relevant statutory subsection speaks of "[e]very person guilty of murder in the first degree * * * committed in a manner involving torture or an aggravated battery to the victim * * *." Section 11–23–2(4).

gust how truly heinous was the murder of Kelly, defendant's wife and a mother of three children.

The mental and physical abuse that defendant inflicted on Kelly began years before her untimely death on June 29, 1996. Kelly's father, Richard McGinity, and her daughter, Jennifer, through statements made at sentencing, have provided this Court with great insight into the most personal and disturbing details of Kelly's relationship with defendant. McGinity explained to the jury how her murder "brought to a climax a murder that started twenty years ago." According to McGinity, his daughter's life changed significantly after she met defendant; it became a life devoid of happiness.

In a most moving and heartfelt letter read aloud to the jury, Jennifer confirmed McGinity's description of her mother's suffering. She wrote, "How many times I would lie in my bed and pray he didn't hurt her, hit her, beat her or torture her any more I can't even count." Jennifer recounted times when defendant had threatened Kelly with bats, golf clubs, a fictitious gun, and finally, the knife.

Evidence of the abuse, both mental and physical, which defendant previously had inflicted on Kelly is particularly relevant to her state of mind the morning of her murder. As he had done so many times before, for at least twelve minutes that morning, defendant tormented his wife with threats that he would kill her. For the first time, defendant's threats materialized, when he repeatedly stabbed his wife while she remained conscious. As if this pain were not enough, defendant left this mother of three incapable of sheltering her two children, who had the misfortune of witnessing such grave brutality at the hands of their father. Instead, she died that morning in her daughter's arms.

Apart from her mental anguish, Kelly endured severe physical pain in the minutes preceding her death. The medical examiner opined that, although several of the stab wounds were not fatal, they would have caused Kelly to suffer severe pain because they indicated that the knife penetrated the musculature and subcutaneous tissue, containing pain fibers. One wound, however, proved fatal. The knife entered Kelly's body just below her left breast horizontally, traveled below her fifth rib, penetrated the pleura cavity surrounding her left lung, perforated through her left lung, entered the pericardial sac, and extended into Kelly's heart. Despite the severity of this wound, Kelly did not immediately lose consciousness. Her left ventricle continued to pump blood to her brain until the blood supply was exhausted. The medical examiner attributed her death to internal bleeding because of the injuries to her heart and lungs, which she suffered as a result of the stab wound to her chest. As if this were not enough, defendant inflicted further mental anguish on Kelly and her children by disconnecting the household telephones in an attempt to prevent calls for help.

Although defendant provides this Court with a long list of cases in which we have held that life imprisonment without parole was an appropriate sentence and argues that these cases involve more heinous murders, we are not persuaded by his attempts to distinguish his case from these. There may have been more heinous, more gory, and more brutal murders in this state, but this Court will not attempt to weigh the degree of atrocity associated with each murder. As we made clear in *Washington*, it is unnecessary to "draw a dividing line when this case is not so far removed from the so-called core cases, those in which the sentence would unquestionably be imposed." *Washington*, 581 A.2d at 1035. The precise manner in

which defendant executed the crime of which he stands convicted does not dictate that his punishment should be any less. What matters is that defendant's behavior was enough to satisfy this Court's definition of aggravated battery, thereby separating his case from other murders in which the possibility of parole has been allowed.

■ Having decided that the trial justice properly concluded that defendant committed first-degree murder by inflicting an aggravated battery on his victim, we proceed to consider whether defendant's character and propensities warranted the imposition of a sentence of life without parole.

The trial justice, in considering this question, offered a detailed explanation for her determination that defendant's crime warranted a sentence of life without parole. The trial justice noted the following:

"To understand [the circumstances surrounding Kelly's death], reference must be made not only to the time frame of the stabbing but to the years of domestic abuse that the victim, [Kelly] McGinity McManus, suffered at the hands of her husband that escalated in the spring of 1996 and reached a crescendo with her death. That continuum of events is critical to a determination of the defendant's intentions at the time of the stabbing."

The trial justice detailed the lifetime of verbal and physical abuse that defendant inflicted upon Kelly and her children. "You created a private life of hell for your wife and your children," the trial justice told defendant. "During your twenty[-]year relationship with [Kelly] you controlled her life. You crushed her carefree spirit. You blamed her for your failings as a husband, father and provider. When she did not obey, when you were jealous and angry, you abused her physically, verbally and mentally." The trial justice continued as follows:

"You may not have had much of a public criminal record, Mr. McManus, but you certainly have a lengthy private one. It is a long and horrendous record, spanning at least twenty years, that included chronic episodes of physical, verbal and psychological abuse of your wife and children. It included cocaine and alcohol use and abuse, domestic disorderly conduct. And, in fact, it may well have included much more violence than we even know and other incidents of abuse that may well have died a secret with [Kelly]. By keeping that record private, you have avoided punishment. You have refused to accept responsibility for your actions and their cumulative long-term effect on your family. You have denied yourself any possibility of meaningful rehabilitation."

After having completed our own review of the record in this case, we conclude that the trial justice captured perfectly the defendant's bad character and evil propensities. It comes as little surprise that an individual capable of committing such a brutal slaying would be the same individual who inflicted a lifetime of abuse on his wife and children. Having exercised our independent judgment in this case, we affirm the imposition of the defendant's sentence to life imprisonment without parole.

### Conclusion

For the reasons set forth herein, the judgment of the Superior Court is affirmed. The record shall be remanded to the Superior Court.

Justice FLAHERTY, dissenting.

I respectfully dissent only from that portion of the majority opinion affirming the sentence of life without the possibility of parole, pursuant to G.L.1956 § 12–19.2–5.

There is no doubt that this was a brutal murder for which this defendant justly was convicted of first-degree murder. It also is yet another tragic example of domestic violence that has proven to be a scourge on our society. I have great respect for the trial justice and believe that the sentence she imposed of life without the possibility of parole was well reasoned. I also have high regard for the opinion of the majority with respect to the sentencing in this case; it is equally rational and founded on the record.

But, after undertaking an independent review of the record that § 12–19.2–5 requires me to do, I do not conclude that this case should be included in that "narrow class of the most heinous crimes" for which this most extreme sentence should be reserved. *State v. Brown*, 898 A.2d 69, 86 (R.I.2006).

Accordingly, I respectfully dissent from the imposition of the sentence of life without the possibility of parole and would reduce the sentence in this case to life imprisonment.