**STATE**

v.

**Maurice ADAMS.**

**No. 83–372–C.A.**

Supreme Court of Rhode Island.

Aug. 21, 1984.

Dennis J. Roberts II, Atty. Gen., James Renaldo, Sharon P. O'Keefe, Sp. Asst. Atty. Gen., Providence, for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Asst. Public Defender, Chief Appellate Atty., Janice M. Weisfeld, Asst. Public Defender, Providence, for defendant.

## OPINION

MURRAY, Justice.

The defendant, Maurice Adams, appeals from a Superior Court conviction of first-degree murder. The defendant was indicted by a Providence County Grand Jury and charged with the murder of Linda Raymond. Pretrial motions were heard on March 14, 1983. The trial commenced on the same date before a justice of the Superior Court and a jury. The jury returned a verdict of guilty on March 24, 1983. The defendant's motion for a new trial was denied on April 7, 1983, and he was sentenced to life imprisonment at the Adult Correctional Institutions.

The facts in this case, which are somewhat involved, are essentially as follows. On June 13, 1981, at approximately eleven o'clock in the evening, Linda Raymond was murdered in the small park adjacent to the Blue Cross/Blue Shield Building in downtown Providence. At about that time, Robert J. Clarke entered the park via the steps at the Empire Street entrance. As he entered the park, he observed a woman lying on the ground and a young, clean-shaven, short-haired man dressed in white pants and a white shirt, leaning over her calling for help. Mr. Clarke was unable to identify the man. The defendant, however, testified that he was the man in the park with the victim.

Mr. Clarke flagged down a passing patrol car. Officer Robert Creighton, who was cruising the area, testified that upon entering the park, he saw the victim lying on the ground, bleeding profusely from the neck. He also testified that defendant was crouched over her, calling for a rescue truck. Officer Creighton paused at the scene for a brief moment before leaving to radio for assistance. The defendant remained at the scene until he was taken to the station by the Providence police.

Doctor William A. Sturner, Chief Medical Examiner for the State of Rhode Island, testified that the victim died from hemorrhaging caused by a four-inch shard of glass that had severed the jugular vein in her neck. Doctor Sturner also testified that strangulation caused by a shoelace tied around the victim's neck, and bruises about her head and face, also contributed to her death.

There were no eyewitnesses to the murder. Several people, however, did observe defendant with the victim both prior to and subsequent to the homicide. Grace Faria, an older woman, testified that she and her boyfriend had been drinking beer in the park where the murder occurred during the late afternoon and evening hours of the day in question. At some point that evening they were joined by Ms. Raymond, the victim. Ms. Faria testified that shortly thereafter, the group was joined by a young, clean-shaven man who seemed to be acquainted with the victim.[1] After about ten minutes, Ms. Faria testified, she and

---

[1] The defendant testified that earlier in the day he had been with the victim and a friend, Todd Chapman, in the Blue Cross park. He testified further that the three of them had been drinking and that the victim had engaged in some sexual activity with the two men. He also stated that the victim then left the park and he went to sleep on a park bench until dusk.

her boyfriend left the park at the Blue Cross/Blue Shield building, leaving defendant and Ms. Raymond alone in the park, except for the presence of an old man sleeping on a bench. Ms. Faria and her boyfriend then walked up to Cathedral Park where they continued their drinking. Shortly thereafter, they headed back to the Blue Cross Park. Upon approaching the park, Ms. Faria testified that she saw defendant on top of Ms. Raymond and surmised that they were making love.[2] The couple therefore did not enter the park, but rather returned to a bar where they had been drinking earlier in the day.

Ms. Debra Kaplan and her husband were also in the area of the Blue Cross park on the night of the murder. They had left their home in Barrington at nine-thirty that evening and had driven into Providence to take in a live show at Lupo's Heartbreak Hotel, a local night spot. Ms. Kaplan testified that she and her husband arrived at Lupo's at about nine-forty-five. When the band took a break, the Kaplans decided to take a walk to check on their new automobile, which was parked on Green Street, near the park. While walking to their car, the Kaplans heard a scream in the vicinity of the Blue Cross/Blue Shield Building. After checking the car, the Kaplans sat down on the steps of the Blue Cross/Blue Shield Building. Ms. Kaplan testified that from that vantage point she could see into the park; she stated that she observed two figures, one lying on top of the other, with the person on top moving up and down. She also testified that the person on top was wearing white shorts and a white T-shirt and had a closely shaved head. After the Kaplans saw another couple walk into and out of the park, they decided to head back to Lupo's. While on their way back to the night club, the Kaplans heard the sound of breaking glass. They went back to the park where they were met at the entrance by a man (Mr. Clarke) who warned them not to go into the park. Ms.

Kaplan testified that they then looked into the park and saw a body on the ground with a person hovering over it screaming for help. That person was defendant, Maurice Adams.

Mr. Jeremiah Ryan was working on the night in question in the Telephone Company building that overlooks the park. Mr. Ryan testified that at approximately eleven o'clock that evening he saw a male wearing a white T-shirt walk to a cement trash receptacle, put his hand into it, remove his hand, and then walk back to the area of the park from which he had come. Mr. Ryan testified further that he saw another man enter the park and then hurry out to the street where he flagged down a passing patrol car. Eventually several police officers arrived and illuminated the scene. Mr. Ryan testified that he was then able to see a body on the ground. He later saw the man wearing the white T-shirt, who had gone to the trash receptacle, led out of the park by the police.

The defendant testified at trial that he had been drinking all day, that he had engaged in sexual activity with the victim, and that he had been with her in the park on the night she was murdered. He denied, however, that he was the one who killed her. His testimony was as follows. He claims that he left Ms. Raymond alive in the park and started to walk home. As he walked, he realized that he was wearing shorts and a shirt but had left a long pair of pants on a park bench. He returned to retrieve them. As he entered the park, he saw Linda Raymond on the ground. He began calling for help and pounding on her chest in an effort to revive her.

After discovering the body, the police summoned the assistant medical examiner, Dr. Edward Murray. Doctor Murray responded to the call, photographed the victim, and had her body removed to the state morgue. Although some preparation of the body and testing were apparently per-

---

**2.** Ms. Faria testified at the suppression hearing that she could not tell who the people were but assumed that they were defendant and Ms. Raymond.

formed by Dr. Murray, the actual autopsy was performed by Dr. Sturner.

The defendant raises several issues upon appeal to this court. Specifically, defendant argues that the trial justice committed error (1) in failing to dismiss the case when it became apparent at trial that the state had not disclosed the existence of a scientific report about an alleged bite mark on the victim's wrist and the existence of a cast impression taken of that bite mark; (2) in failing to grant his motion to dismiss the case pursuant to both Rule 48(b) of the Superior Court Rules of Criminal Procedure and his state and federal constitutional right to a speedy trial; (3) in permitting Dr. Sturner to testify that marks appearing on the victim's wrist were consistent with bite marks when the doctor could not so testify to a reasonable degree of medical certainty; and (4) in denying his motion to suppress oral statements made by him, tangible evidence seized from him, and evidence of a lineup identification because they were all fruits of an arrest that was not supported by probable cause.

I

The issue of the state's failure to disclose a scientific report and a tangible object that was the result of a scientific test arises from the existence of a bite mark on the victim's wrist and a cast impression of that mark taken by Dr. Murray.

Defense counsel moved under Rule 16(a)(5) for discovery of all scientific tests and any tangible evidence connected thereto. Pursuant to this discovery motion, the state produced Dr. Sturner's autopsy report. Among the injuries described in the autopsy report was "[a] circular configuration up to 1¼ inches in greatest diameter * * * noted in the medial wrist area [showing] intermittent superficial abrasions with minimal vital reaction of a pink-red color and some areas with no vital reaction." The report also indicates that "[t]hree swabs of the left ventral wrist marking [were] saved along with mold of skin." The report findings also include a "circum-ferential area of ventral wrist consistent with a bitemark."

At trial, the state elicited testimony from Dr. Sturner that a bite mark appeared on the victim's left wrist. Earlier, the state had introduced a photograph of the victim's left wrist. Defense counsel elicited testimony from Detective Donald Kaplan that an impression of defendant's mouth had been taken at the police station. Upon cross-examination of Detective Kaplan, the prosecution attempted to introduce a report prepared by Dr. Murray. Defense counsel objected to the introduction of the report on the ground that it had not been given to him in the preparation of defendant's case. The objection was sustained.

Doctor Murray's report contains a statement that the victim "had a remarkably clear bite mark on the left wrist inner aspect, but this was fading very, very rapidly. It was photographed at the scene, and it was swabbed with dry swab, saline swab and casted as soon as we arrived back at the morgue." Subsequent to the state's attempt to utilize the report, defense counsel moved on two separate occasions to pass the case. These motions were denied. The trial justice did, however, ask the prosecutor to produce the report, which was turned over to defendant on the last day of testimony.

During argument on defense counsel's second motion to dismiss the case for failure to produce Dr. Murray's report, the prosecutor attempted to justify the nondisclosure of the report as follows:

"The State never intended to use Dr. Murray or his report in its case in chief, nor did we do so. With regard to having seen the report, Dr. Sturner's office is a public office, and the Public Defender's Office is one of the more frequent visitors to Dr. Sturner's office in the preparation of cases, and Dr. Sturner's office has always made its files available to its personnel. Mr. O'Connor has been there on several occasions and has had the opportunity to interview Dr. Sturner, Dr. Burns and a variety of medical examin-

ers in preparation of various cases. Dr. Sturner has had his records in full disposal of Mr. O'Connor. Not something the State had in a prosecution sense, has any exclusive control over. Nonetheless, the State never intended, nor did it use Dr. Murray's report in its case in chief. I have no problem giving that report to Mr. O'Connor, nor filing that copy of same report with the Court and letting it go at that."

Again we note that defense counsel requested the discovery of scientific reports and tangible evidence connected thereto pursuant to Rule 16. The record discloses that defendant filed a motion for production of tangible evidence on October 7, 1981. When defense counsel ultimately inspected the tangible evidence, however, the cast impression of the bite mark was not disclosed.

The defendant argues that the state's failure to disclose the existence of Dr. Murray's report, and the tangible evidence connected with it, constitutes deliberate nondisclosure in violation of Rule 16 and warrants reversal of his conviction. The state, on the other hand, contends that the trial justice's failure to dismiss the case was not error because defendant had been made aware of the existence of the cast impression of the bite mark, through Dr. Sturner's report, fifteen months prior to the trial. It is further argued by the state that its failure to disclose the cast was inadvertent and that defendant should have been aware of its existence by virtue of Dr. Sturner's report. Most significantly, the state argues here, as it did at trial, that since the prosecutor never intended to call Dr. Murray as a witness, the report was outside the scope of Rule 16. Along these lines, the state also claims that Dr. Murray's report was not a report of a physical examination or scientific test. We must disagree with all of these arguments.

■ In *State v. Verlaque,* R.I., 465 A.2d 207, 214 (1983), we stated that "[t]he language of Rule 16 is very clear. The prosecutor must provide a defendant with specific information when requested. The prosecutor does not have the authority to interpret the rule and decide what constitutes substantial compliance." Although we were dealing in that case with the production of a witness list, our clear mandate is applicable to the present case. Similarly, we have said that "[w]hen the defense is misled into proceeding to trial unprepared, the basic precepts of due process are violated." *State v. Concannon,* R.I., 457 A.2d 1350, 1353 (1983). Indeed, we have gone so far as to hold that where there has been deliberate failure to comply with Rule 16, "we will grant a new trial without inquiry into the degree of harm caused by the misconduct." *Id.; see also State v. Verlaque,* 465 A.2d at 214.

Applying these principles to the present case, we address, at the outset, the state's argument that defendant had been informed of the existence of the cast through Dr. Sturner's report. We note that Dr. Sturner's report does make reference to a bite mark and to a mold taken of that mark. These references are not so crystal clear, however, as the state contends. It is quite possible that defense counsel could have missed these references. Doctor Sturner's report notwithstanding, the state's argument begs the central question to which we must address ourselves—that is, why didn't the state turn over Dr. Murray's report to defendant? That report made explicit reference to the bite mark and the cast taken of that mark. Contrary to the state's argument, defendant should not have been forced to rely exclusively upon Dr. Sturner's report.

The language of Rule 16(a)(5) is quite clear. Under that rule, a defendant is entitled to the discovery of

"all results or reports in writing, or copies thereof, of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case and, subject to an appropriate protective order under paragraph (f), any tangible objects still in existence that

were the subject of such tests or experiments."

In *State v. Faraone*, R.I., 425 A.2d 523, 525 (1981), we noted that the right to discovery under Rule 16(a) "provides for extensive discovery on the part of a defendant in a criminal case going far beyond the requirements of due process."

■■■ Contrary to the state's argument, in the present case, Dr. Murray's report was a report of a physical examination within the ambit of Rule 16(a)(5). Clearly, Dr. Murray examined the victim's body and made a detailed report of his findings. Most importantly, Rule 16(a)(5) does not make disclosure of such reports contingent upon whether the state intends to use such a report at trial. Such an interpretation would clearly defeat not only the letter but also the spirit of Rule 16, which is intended to prevent the trial of a criminal case by ambush. *See State v. Diaz*, R.I., 456 A.2d 256, 258 (1983). In light of the clear statement of the rule, the prosecutor was absolutely without authority to interpret Rule 16(a)(5) so as to excuse the nondisclosure of Dr. Murray's report on the basis that it would not be used at trial. The danger of this interpretation became self-evident at trial. Notwithstanding the state's determination that the report was not significant and would not be used at trial, the report nevertheless became quite important. The state itself attempted to utilize that very report to demonstrate the inability of the police to make a comparison of the cast described therein with an impression taken of defendant's mouth.

The violation of Rule 16(a)(5) in the present case, is compounded by the fact that the cast impression of the bite mark was not made available to defense counsel at the requested tangible-evidence viewing. Again Rule 16(a)(5) places no limitation upon the discovery of tangible evidence based upon whether the evidence or scientific tests performed thereon would be used at trial. In *State v. Faraone, supra,* we *were* presented with a factual situation in which the defendant had made a request to

analyze marijuana that had been tested for the state by a state toxicologist. Although we found no violation of due process in that case, we went on to state with regard specifically to Rule 16(a)(5) that "it seems apparent that subject to appropriate safeguards, a defendant may examine a substance or article, or other tangible object, which has been the subject of a scientific test or examination by an expert witness for the state." 425 A.2d at 525–26.

On the basis of the record of the case before us, we are satisfied that the cast impression of the marks on the victim's wrist was a tangible object that was the result of a scientific test. It is our conviction that the state's failure to ensure that this cast impression was made available at the tangible-evidence viewing was a violation of Rule 16(a)(5). We so hold notwithstanding the fact that the state did not intend to call Dr. Murray as a witness or to use his report or the cast impression at trial. We note again, however, that the state did ultimately disclose the existence of the report for the first time at trial.

Without question, Dr. Murray's report, with its clear reference to the bite mark and the cast taken thereof, was a relevant and material element of the state's case. *See State v. Faraone*, 425 A.2d at 526. This is evidenced by the fact that the state brought out the existence of the bite mark upon direct examination of Dr. Sturner. From defendant's prospective, the importance of this report is obvious. Had the cast impression been made available to defendant prior to trial, he would have been able to obtain an independent forensic dentist to examine the cast and the impression taken of his own mouth. The results of such a test could have been very significant to defendant.

Upon a review of the entire record, we are satisfied that the state's improper interpretation of Rule 16(a)(5), resulting in the nondisclosure of Dr. Murray's report and the cast impression of the bite mark, was deliberate. It is unnecessary for us, therefore, to inquire into the degree of harm

caused by the noncompliance, *State v. Verlaque*, 465 A.2d at 214; *State v. Concannon*, 457 A.2d at 1353.

## II

The defendant argues that the trial justice abused his discretion (1) in denying defendants' motion to dismiss pursuant to Rule 48(b) of the Superior Court Rules of Criminal Procedure and (2) in denying defendant's motion to dismiss on the ground that he had been denied his state and federal constitutional right to a speedy trial. The delay complained of by defendant is twenty-one months from the time he was charged to the time of trial.

### A

■ Regarding defendant's argument with respect to Rule 48(b), we note that "[t]he Sixth Amendment to the United States Constitution and art. I, sec. 10 of the Rhode Island Constitution guarantee to a criminal defendant the right to a speedy trial. Rule 48(b) was designed to implement that right." *State v. Isaac*, 477 A.2d 62 at 64 (R.I.1984); *State v. Baccaire*, R.I., 470 A.2d 1147, 1149 (1984); *State v. Wilmot*, R.I., 461 A.2d 401, 404 (1983). As we have said many times, however, "the statutory right conferred by Rule 48(b) is actually far broader in scope than the constitutional guarantees from which it is derived." *State v. Isaac*, at 64; *State v. Baccaire*, 470 A.2d at 1149. Consequently, the Rule places a greater burden on the state than do the constitutional provisions to bring a defendant to trial with a minimum of delay. Pursuant to Rule 48(b), an indictment may be dismissed even though there has been no constitutional violation. *State v. Isaac*, at 64–65; *State v. Baccaire*, 470 A.2d at 1149–50; *State v. Paquette*, 117 R.I. 505, 511, 368 A.2d 566, 569 (1977).

■ Pursuant to Rule 48(b), the Superior court has "the power to dismiss an indictment, information, or complaint solely because of unnecessary delay in bringing a defendant to trial." *State v. Isaac*, at 64; *State v. Baccaire*, 470 A.2d at 1149; *State*

*v. Wilmot*, 461 A.2d at 404. "A defendant need only demonstrate that he or she is not responsible for any of the delay in question to raise a presumption of unnecessary delay." *State v. Baccaire*, 470 A.2d at 1150; *see also State v. Isaac*, at 64. Because a motion to dismiss pursuant to Rule 48(b) is addressed to the sound discretion of the court, "the trial justice's ruling will be set aside on appeal only if it constitutes a clear abuse of such discretion." *State v. Isaac*, at 64; *State v. Baccaire*, 470 A.2d at 1150; *State v. Wilmot*, 461 A.2d at 404.

■ In the present case, defendant argues that most of the delay from the time of arraignment to the time of trial is attributable to the state's failure to comply with discovery requests. Conversely, it is defendant's contention that the only delay attributable to him during this time was a four to six-week period resulting from defendant's November 24, 1982 request to continue the trial. The state, however, argues that it made every attempt to comply with defendant's discovery requests and to supply defendant with new information as it became available. The state also points out that defendant required four months to comply with the state's request for discovery. The record also discloses that a dispute over the payment of fees for photographs provided to defendant also contributed to the delay. In addition to these and other reasons for delay, the case was reassigned on October 4, 1982, because both the prosecutor and defense counsel had other trial commitments. The only other significant delay resulted from the state's motion to vacate the trial date on January 19, 1983. The court granted this motion because two of the state's witnesses were unavailable for medical reasons.

Upon a careful review of the record with regard to this question, it is clear that defendant was responsible for some of the delay in this case. Notwithstanding the state's violation of Rule 16, discussed in the previous section of this opinion, the state cannot be charged with responsibility for

all of the delay resulting from the efforts of both parties to finalize discovery in this case. This delay can be attributed to both parties. Just as defendant cannot be held responsible for dilatory compliance by the state, so too the state cannot be held responsible for the delaying effects of defendant's zealous efforts to obtain complete discovery. The record also discloses that defendant's counsel requested a continuance on one occasion and had other trial commitments, as did the prosecutor, on another occasion. Finally, we cannot say that any other periods of delay that defendant claims were attributable to the state were unnecessary.

In light of the foregoing, defendant has not raised a presumption of unnecessary delay, thereby requiring the prosecution to rebut that presumption by showing justification for the delay. *State v. Isaac*, at 64, *State v. Baccaire*, 470 A.2d at 1150. We are satisfied, therefore, that the trial justice did not abuse his discretion in denying defendant's motion to dismiss pursuant to Rule 48(b).

### B

■■■ Our ruling on defendant's Rule 48(b) motion is not dispositive of his claim that the delay in bringing the present case to trial constitutes a violation of his state and federal constitutional right to a speedy trial. We have said that

"[r]esolution of this issue requires a consideration of the four factors enumerated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117 (1972): (1) length of the delay, (2) reasons for the delay, (3) defendant's assertion of the right to a speedy trial, and (4) prejudice to the accused." *State v. Baccaire*, 470 A.2d at 1150; *State v. Anthony*, R.I., 448 A.2d 744, 749 (1982).

As we said in *State v. Baccaire*, 470 A.2d at 1150, "[i]t is well settled that the length of the delay does not by itself establish a deprivation of the right to a speedy trial." In the present case, however, we are satis-

fied that the twenty-one-month delay from the time of arraignment to the time of trial is of sufficient duration to require inquiry into the remaining three factors of the *Barker* test.·

■■■ On the basis of the record before us, as discussed above, we cannot say that the state was solely responsible for the delay in this case. Furthermore, we do not find that the delay attributable to the state was tactically motivated. *See State v. Baccaire*, 470 A.2d at 1150. Contrary to defendant's argument, the state cannot be charged with all of the responsibility for the delay involved in the discovery period.

Applying the third factor in the *Barker* analysis, we note that defendant did not file a speedy-trial motion or a motion to dismiss pursuant to Rule 48(b) until January 19, 1983, less than two months prior to trial. We also note that these motions were renewed at the time of trial. This conduct clearly does not represent an active pursuit on the part of defendant of his right to a speedy trial. Although this lack of aggressive action does not alone constitute a waiver of the right, it is a significant factor that must be considered in the speedy-trial analysis. *See State v. Baccaire*, 470 A.2d at 1150; *State v. Anthony*, 448 A.2d at 750.

The final factor in the *Barker* analysis "focuses upon prejudice in the form of pretrial incarceration, anxiety and mental strain, and impairment of the defense." *State v. Baccaire*, 470 A.2d at 1151 (citing *State v. Anthony*, 448 A.2d at 751); *State v. Charette*, R.I., 434 A.2d 280, 285 (1981); *State v. Fortier*, R.I., 427 A.2d 1317, 1322 (1981). The defendant in the present case was incarcerated for the entire period from his arrest until trial. Although we are cognizant of the fact that anxiety and mental strain are heightened by incarceration, we cannot ignore the fact that defendant was awaiting trial for a most vicious and brutal murder. More importantly, there is no evidence in the record to support a finding ·that defendant's ability to conduct

his defense was impaired by the fact of his incarceration or the passage of time. *See State v. Baccaire,* 470 A.2d at 1151.

Upon a review of the record in light of the four-part test set forth in *Barker,* it is our conviction that the defendant's right to a speedy trial has not been violated. *Id.*

### III

■ The defendant argues that the trial justice committed error when he permitted Dr. Sturner to testify, over objection, that marks appearing on the victim's wrist were consistent with bite marks. We agree.

During direct examination of Dr. Sturner, the prosecutor showed to the doctor a photograph of the victim's left arm and wrist. Defense counsel immediately objected and argued at side bar that he believed that the prosecutor was going to attempt to elicit testimony from Dr. Sturner that the marks were bite marks. Defense counsel further argued that Dr. Sturner would not be able to testify, to a reasonable degree of medical certainty, that the marks in question were bite marks since forensic dentistry was not within the doctor's specialty. Defense counsel requested, therefore, that the trial justice preclude the prosecutor from inquiring about the marks. In the alternative, defense counsel requested that if the prosecutor was to be allowed to pursue this line of questioning, the question be framed so as to require the doctor to testify to a reasonable degree of medical certainty. The court's response was merely to state that "[i]f the witness can answer within a reasonable degree of medical certainty, I'm going to allow it, because I do have respect for his qualifications."

Following the side-bar conference, the prosecutor again showed Dr. Sturner the photograph, and the doctor noted the bruise and its location. The prosecutor then asked whether there was a unique pattern to that bruise. At this point defense counsel objected and was overruled. Doctor Sturner then answered that the bruise was consistent with a bite mark.

Defense counsel then moved that the answer be stricken. That motion was also denied.

In a long line of civil cases, this court has required that expert testimony must speak in terms of strong probability, not mere possibility. *See Da Vinci Creations, Inc. v. Nu-Frame Co.,* R.I., 418 A.2d 851, 854 (1980); *Montuori v. Narragansett Electric Co.,* R.I., 418 A.2d 5, 10 (1980); *Mullaney v. Goldman,* 121 R.I. 358, 363, 398 A.2d 1133, 1136 (1979); *Evans v. Liguori,* 118 R.I. 389, 398, 374 A.2d 774, 778 (1977). In *State v. Giragosian,* 107 R.I. 657, 664–65, 270 A.2d 921, 925–26 (1970), a medical doctor, testifying as an alibi witness in a criminal trial, stated that he had given the defendant Demerol, which caused him to fall asleep. Defense counsel then asked the doctor if the defendant could have walked five miles to the scene of the crime in that medicated condition. The doctor indicated in his answer that everyone has a different tolerance to medication and that he did not know what the defendant's tolerance was. The state objected when the defense counsel then asked what other physical effects Demerol had on a person, and the objection was sustained. This court sustained the trial justice's ruling, stating that "[i]t is clear from what [the doctor] said in reply to [the previous question] that, without knowing a person's habits and tolerance to this drug, he could not answer this question with reasonable medical certainty." *Id.* at 666, 270 A.2d at 926.

In the present case, it should have been apparent to the trial justice that Dr. Sturner was not testifying, to a reasonable degree of medical certainty, that the marks on the victim's wrist were bite marks. Defense counsel had informed the trial justice at side bar that Dr. Sturner was not an expert in forensic dentistry. Moreover, defense counsel requested that if the prosecutor was going to be allowed to ask the question, then he should be required to answer within a reasonable degree of medical certainty. In light of the fact that he had been clearly forewarned by defense

counsel, the trial justice committed error in overruling defense counsel's objection to the question and in denying his motion to strike. This error is illuminated by the fact that Dr. Sturner admitted upon cross-examination that he could not state with any degree of medical certainty that the marks on the victim's wrist were bite marks. As Dr. Sturner testified, only an expert in forensic dentistry, which he is not, could testify to that degree of certainty.

■ The state argues that even if Dr. Sturner's testimony was not admissible as an expert opinion, it was admissible as a nonexpert opinion. We find this argument to be without merit. Doctor Sturner's entire testimony was premised upon his expert qualifications. It would have been unreasonable to assume, under these circumstances, that after hearing a great deal of medical testimony from a most eminent expert *in his field*, the jury could have accorded lesser weight to his testimony regarding the bite marks. Additionally, Dr. Sturner merely stated that the marks in question were "consistent with bite marks." If in fact the state was attempting to offer his testimony on this matter as a nonexpert opinion, a proper foundation was not laid. *Cf. State v. Bowden*, R.I., 473 A.2d 275, 280 (1984) (the admission of brief and conclusory nonexpert testimony regarding bruises found to be error where the necessary foundation had not been established).

Since our finding of error with regard to the Rule 16 requires that this case be remanded for a new trial, it is not necessary for us to consider whether the trial justice's error in failing to sustain defense counsel's objection and grant his motion to strike was harmless.

### IV

The defendant argues that the trial justice committed error in denying his motion to suppress oral statements made by him at the Providence police station, tangible evidence taken from him by the Providence police, and evidence of a lineup identification made by Grace Faria because all of this evidence was the fruit of an illegal arrest.

At the suppression hearing, defense counsel brought various motions concerning the evidence enumerated above to the attention of the trial justice. The trial justice determined, and both sides agreed, that there would be a preliminary hearing on the identification issue and that the other suppression issues would be addressed as they arose at trial. Thereafter, Grace Faria took the stand and testified about the identification that she made of defendant at the Providence police station. That testimony was corroborated by Detective Kaplan.

■ Following this testimony, defense counsel argued that the state had failed to establish that the police had probable cause for the arrest. The state argued that the question of probable cause was irrelevant to the issue of the lineup identification by Grace Faria. The trial justice agreed with the state's argument and denied the motion to suppress. The trial justice erred in failing to perceive that a determination of the legality of the arrest was an essential predicate for the admission of any evidence that might be a fruit of such detention, line-up evidence or otherwise. *See Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nevertheless, it is clear from an examination of the record that the trial justice failed to make a determination of the legality of the arrest and to make the necessary findings of fact and conclusions of law in order to establish the existence of probable cause for such arrest. *See State v. Dechene*, 114 R.I. 276, 278, 332 A.2d 125, 126–27 (1975). Therefore, we must make an independent judgment concerning whether the arrest was supported by probable cause. *See In Re John N.*, R.I., 463 A.2d 174, 176 (1983).

■ As we stated in *In Re John C.*, R.I., 425 A.2d 536, 538 (1981), probable

cause "exists when, at the moment of arrest, the facts and circumstances within the police officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person's believing that the prospective arrestee had committed or was committing an offense." We also stated that "it is the cumulative effect of all the facts and circumstances present at the time of the arrest which determines probable cause, and this mosaic is to be viewed as through the eyes of a reasonable and cautious police officer on the scene, guided by his or her experience and training." *Id.* 425 A.2d at 538–39.

■■■ Applying these principles to the present case, a review of the record discloses ample evidence that probable cause existed for defendant's arrest. Patrolman Creighton was a police officer with ten years of experience and training. He was signaled to stop his vehicle while patrolling the area in which Ms. Raymond was murdered. After speaking with Mr. Clarke and Ms. Kaplan, he immediately parked his patrol car on Empire Street in front of the steps leading to the park. Upon entering the park, he observed defendant leaning over the victim's body with both hands on her chest. The patrolman saw no one else in the area. The victim was observed bleeding profusely from the neck, her body still warm. The defendant's arms, hands, and clothing were covered with blood. The patrolman also saw a pair of men's pants on a park bench in close proximity to the victim. Broken glass was observed on the bench, on the victim's body, and all about the surrounding area.

It is our conclusion that these facts undoubtedly support a finding of probable cause to arrest the defendant for the murder of Linda Raymond.

V

For the reasons stated, the defendant's appeal is sustained, the judgment of conviction is reversed, and the case is remanded to the Superior Court for a new trial.