November 26, 2025

**Supreme Court**

No. 2023-82-M.P.
(PM 16-2668)

Dana Gallop                    :

v.                             :

State of Rhode Island.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Dana Gallop                    :

v.                    :

State of Rhode Island.         :

Present:  Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  The petitioner, Dana Gallop (petitioner or Gallop), seeks review of a judgment of the Superior Court denying his application for postconviction relief.  On certiorari, Gallop challenges what he characterizes as the trial justice's decision to deny his motion for summary disposition, as well as the state's purported failure to disclose alleged inducements given to two eyewitnesses in exchange for their testimony.  For the reasons discussed, we reject the claims of error and affirm the judgment of the Superior Court.

## Factual Background

The facts underlying Gallop's conviction are set forth more fully in *State v. Gallop*, 89 A.3d 795 (R.I. 2014).  We recite the salient facts.

- 1 -

On December 13, 2008, a disc jockey of some repute was performing during the late evening hours at Passions, a nightclub in Providence, Rhode Island. In the early morning hours of December 14, 2008, the nightclub closed and an estimated 800 patrons began dispersing onto the streets outside the venue. Suddenly, at approximately 2:27 a.m., gunfire erupted. Within seconds, two people were struck, one of whom, Anthony Parrish, later succumbed to his injuries. Two eyewitnesses identified Gallop as the shooter.

Shamair Barboza was twenty-seven years old at the time of trial.[1] She testified that she had known Gallop since she was ten years old and that Parrish was a close friend. On the late evening/early morning of the shooting, Barboza was at the Passions nightclub and separately recognized Parrish and Gallop as patrons. When the nightclub closed, Barboza left the premises and watched as Parrish began walking toward Gallop. As Barboza testified at trial, she was fixated upon this impending interaction "[b]ecause I knew that they had bad blood," "[t]hey weren't very friendly with each other," and "I just knew there wasn't going to be a good outcome." Barboza's premonition proved ominously prophetic; she witnessed Gallop as he lifted his hoodie, retrieved a weapon, and fired it. Parrish fell to the ground, mortally wounded.

---

[1] The record reflects different spellings of the witness's first name. We adopt the spelling used in *State v. Gallop*, 89 A.3d 795 (R.I. 2014).

- 2 -

Nakia Green was also outside the Passions nightclub at the time of the early-morning shooting. At the moment of the initial gunshot, Green was approximately eight feet from Gallop and focused on him for five to ten seconds. Although she had never had any previous interaction with Gallop, eight days after the shooting, on December 22, 2008, she made a positive identification from a photographic lineup.

A jury convicted Gallop of first-degree murder and related criminal offenses. He was sentenced to two life sentences and a twenty-year sentence, all to be served consecutively. Gallop also received two ten-year sentences, concurrent with the first life sentence. Finally, pursuant to the habitual-offender statute, *see* G.L. 1956 § 12-19-21, the trial justice sentenced Gallop to an additional nonparoleable twenty-five-year sentence, consecutive to the twenty-year consecutive sentence. Gallop appealed the conviction to this Court, which we affirmed. *See Gallop*, 89 A.3d at 806.

In June 2016, Gallop filed a *pro se* application for postconviction relief. After the passage of several years, on September 20, 2021, Gallop, now represented by legal counsel, filed a memorandum in support of his motion for summary disposition pursuant to G.L. 1956 § 10-9.1-6(c). The crux of Gallop's legal argument was that prior to trial, the state failed to disclose that Barboza and Green were in the witness

protection program (WPP)[2] and had been financially compensated in exchange for their testimony. The state filed a memorandum in opposition and subsequently, the trial justice scheduled the matter for a hearing on Monday, July 18, 2022. On June 1, 2022, Gallop filed a response and, on Thursday, July 14, 2022—days before the scheduled hearing—he filed yet another memorandum with an accompanying appendix. The trial justice promptly issued an order declaring that "[o]n Thursday, July 14, 2022, petitioner unexpectedly filed a twenty-one (21) page Supplemental Memorandum in Support of his [Postconviction-Relief] Application. Because of this eleventh-hour filing, the July 18, 2022 hearing is hereby cancelled." (Emphasis omitted.)

On January 18, 2023, an evidentiary hearing on the application for postconviction relief ensued. The petitioner presented the testimony of his trial counsel, and the state called the prosecutor. Trial counsel, a former prosecutor, testified forthrightly and professionally that, based on discussions with the prosecutor, he "was well aware early on * * * that there was a great reluctance, on behalf of Miss Green, to come forward, and that there would be some type of attempt, at her request * * * to be relocated prior to trial." Based upon this

---

[2] The witness protection program was created through G.L. 1956 chapter 30 of title 12, entitled "Protection and Supervision of Criminal Witnesses." A witness protection review board reviews and approves, among other things, "the nature and cost of the protection to be afforded." Section 12-30-4.

knowledge, trial counsel also related that he "assumed that there would be some expenditure," adding, "that's only natural." Although trial counsel initially testified that he had no recollection of having a conversation during which the state similarly advised him that Barboza would be in the WPP, he later added that he "may have [had such a conversation with the prosecutor]. I don't have any recollection of that at this time." Trial counsel was steadfast that the state never revealed that Barboza was receiving financial support.

The assistant attorney general who prosecuted the case contradicted trial counsel's testimony on several important points. For instance, she testified that whether a witness was in the WPP was, in her opinion, "always discoverable," but she did so orally and never in writing to avoid public disclosure of information that could jeopardize a witness's security. She stressed that no direct payments were made to Barboza or Green in exchange for their testimony and that she was "confident that I told [trial counsel] about Miss Green being in witness protection, and I am equally confident that I told [trial counsel] that Miss Barboza was going to be utilizing witness protection."

In resolving the application for postconviction relief, the trial justice recognized that there was no dispute that the state had disclosed that Green was in the WPP. With respect to Barboza, the trial justice expressed:

> "In all, I find, unreservedly, that [the prosecutor's] testimony
> and memory that she had spoken to [trial counsel] about

[Shamair] Barboza being in witness protection, just as she had discussed with him that Nakia Green was in witness protection, is the most reliable and trustworthy.

"Put simply, there would have been absolutely no reason for [the prosecutor] to withhold that information about [Shamair] Barboza. She had told [trial counsel] about Nakia Green; they discussed it. And there is no doubt in my mind, from where I sat as a front-row observer at the [postconviction-relief] hearing, that [the prosecutor's] memory is accurate and that she told [trial counsel] about [Shamair] Barboza.

"Withholding that information from [trial counsel] would have been foolhardy, not to mention entirely unprofessional and unethical, and I categorically decline to ascribe such conduct to her in this case."

Accordingly, the trial justice concluded that the state had disclosed that Barboza and Green were in the WPP and that Gallop had not carried his burden of proof; thus he denied the application for postconviction relief.

Gallop promptly alerted the trial justice that the bench decision did not address the alleged nondisclosure of the WPP expenditures. The trial justice initially expressed that the expenditure issue was not raised during the postconviction-relief hearing, but thereafter concluded, "I don't think it's at all meaningful or material at all. And I would not in any way suggest by nuance, or hint, or scintilla, or iota of evidence that this has anything whatsoever to do with this [postconviction-relief] hearing and the outcome of the case." Judgment entered for the state and Gallop filed a petition for a writ of certiorari, which we granted.

Additional relevant facts will be discussed as necessary.

- 6 -

## Standard of Review

Pursuant to § 10-9.1-1, postconviction relief "is available to a defendant convicted of a crime who contends that his original conviction or sentence violated rights that the state or federal constitutions secured to him." *Gordon v. State*, 18 A.3d 467, 473 (R.I. 2011) (quoting *Young v. State*, 877 A.2d 625, 628 (R.I. 2005)). "This Court will not disturb a trial justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings." *Id.* (quoting *Bustamante v. Wall*, 866 A.2d 516, 522 (R.I. 2005)). "When we review a determination of whether a violation of Rule 16 [of the Superior Court Rules of Criminal Procedure] or *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] occurred, the applicable standard [of review] is narrow: the trial justice must have committed clear error." *State v. Briggs*, 886 A.2d 735, 755 (R.I. 2005).

## Discussion

The petitioner contends that the trial justice erred when he denied (1) the motion for summary disposition and (2) the application for postconviction relief, which was based upon the state's purported failure to disclose that Barboza and Green were in the WPP and incurred related expenses. Gallop claims that the purported nondisclosures violated Rule 16 and *Brady*. We disagree.

## A

## The Motion for Summary Disposition

Section 10-9.1-6(c) provides that "[t]he court may grant a motion by either party for summary disposition of the application when it appears from the pleadings, depositions, answers to interrogatories, and admissions and agreements of fact, together with any affidavits submitted, that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." "[S]ummary dismissal under § 10-9.1-6(c) 'closely resembles' a grant of summary judgment under Rule 56 of the Superior Court Rules of Civil Procedure * * *." *Reyes v. State*, 141 A.3d 644, 652 (R.I. 2016) (quoting *Palmigiano v. State*, 120 R.I. 402, 405, 387 A.2d 1382, 1384 (1978)).

In this matter, Gallop filed a memorandum in support of his motion for summary disposition; the state filed an objection, and, on June 1, 2022, Gallop submitted a response. At this juncture, the parties had completed their written arguments and the motion was due to be heard on the previously scheduled date, Monday, July 18, 2022. However, on Thursday, July 14, 2022—just days before the scheduled hearing—petitioner surprisingly filed an additional twenty-one-page supplemental memorandum and, for the first time, a thirty-four-page appendix. The trial justice responded to what he described as an "unexpectedly * * * eleventh-hour filing" by promptly canceling the July 18, 2022 summary-disposition hearing.

- 8 -

Although Gallop insists that the trial justice erred when he "denied" the motion for summary disposition,[3] the state counters that a hearing on the motion never occurred and that petitioner never raised an objection. Thus, the state submits, this issue is waived. We agree.

It is beyond question that "this Court staunchly adheres to the raise or waive rule." *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016) (brackets omitted) (quoting *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011)). "As we have said on innumerable occasions, 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'" *Id.* at 172 (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)). Generally, we "will not overturn a judgment based on an alleged error that was not brought to the attention of the trial justice." *State v. Tavares*, 312 A.3d 449, 458 (R.I. 2024).

The record is pellucid that Gallop never objected to the cancellation of the hearing on the motion for summary disposition. Nor did Gallop complain to the trial

---

[3] Relatedly, Gallop contends that the trial justice erred when he assessed the credibility of the witnesses (trial counsel and the prosecutor) during the summary-disposition hearing. As discussed, the trial justice canceled the hearing on the motion for summary disposition, and Gallop raised no objection. Rather, the record is clear that the trial justice conducted an evidentiary hearing on the merits. *See* G.L. 1956 § 10-9.1-6(b) ("Disposition on the pleadings and record is not proper if there exists a genuine issue of material fact."). Because a hearing on the motion for summary disposition did not occur, Gallop's argument that the trial justice erred by making factual findings is misplaced.

- 9 -

justice that he was deprived of a hearing on the motion for summary disposition. Accordingly, this issue is waived, and we have no occasion to consider it.[4]

## B

## The Eyewitnesses' Participation in the WPP

Next, Gallop avers that the state intentionally withheld discovery that would have revealed that Barboza and Green were in the WPP. The petitioner contends that the nondisclosure violated Rule 16 and *Brady*, and, thus, the trial justice erred when he denied the application for postconviction relief. We swiftly dispense with this claim.

As a result of an evidentiary hearing, the trial justice resolved a factual dispute and supportably concluded that the state had disclosed that Barboza and Green were in the WPP. In this regard, it is undisputed that during the postconviction-relief hearing, trial counsel testified that he had "a very specific recollection of [the prosecutor] early on indicating that Miss Green * * * at some point she was going to

---

[4] Notwithstanding the cancellation of the hearing on the motion for summary disposition, for the reasons detailed in this opinion, the motion should have been denied. The denial of a motion for summary disposition is an interlocutory order and, "absent 'peculiar circumstances,'" is not immediately appealable to this Court. *See Henderson v. Nationwide Insurance Company*, 35 A.3d 902, 905 n.6 (R.I. 2012) (quoting *Estate of McAlpine v. Estate of McAlpine*, 120 R.I. 135, 143, 386 A.2d 179, 183 (1978)). Moreover, "[a]ny error in denying the motion is rendered harmless by a fair determination of the merits at trial." *Estate of McAlpine*, 120 R.I. at 143, 386 A.2d at 183. As discussed herein, Gallop was afforded an evidentiary hearing on his application for postconviction relief and a judgment on the merits followed.

- 10 -

be relocating. * * * There's no question [the prosecutor] and I had discussions with regard to Nakia Green." Although the evidence may have been conflicting concerning whether the state similarly advised Gallop that Barboza would be in the WPP, the trial justice reviewed the record and concluded that the state made such an oral disclosure. Likewise, we have carefully reviewed the record and conclude that, in arriving at this determination, the trial justice did not overlook or misconceive any material evidence.[5] *See, e.g.*, *Gordon*, 18 A.3d at 473 ("This Court will not disturb a trial

---

[5] The trial justice supported this credibility determination. In the first instance, the trial justice recalled trial counsel's testimony that he had no recollection concerning having any conversations regarding Barboza's participation in the WPP. But somewhat contradictorily, when trial counsel was later asked whether he had "any oral conversation" with the prosecutor about Barboza's participation in the WPP, he answered, "I may have. I don't have any recollection of that at this time." In a second instance, the trial justice referenced a notable discrepancy concerning petitioner's age and Barboza's age on the date of the shooting. Trial counsel testified that it was his recollection that Barboza was a few years *younger* than Gallop and trial counsel also recalled testifying at his deposition that Barboza was as many as ten years *younger* than Gallop. In actuality, Barboza testified during trial that she was twenty-seven years old, approximately one year *older* than Gallop. When confronted with this testimony, trial counsel simply retorted, "I don't have any recollection of that" and "I could be mistaken." As noted by the trial justice, this discrepancy was material because if Barboza was a decade younger than Gallop, she would have been "about 14 or so at a bar when she witnessed the events * * *." In a third instance, trial counsel testified that prior to trial it was his intention that the jury not learn that Barboza or Green were in fear of Gallop. When confronted with the trial testimony documenting such an inquiry, trial counsel responded that he had "no recollection of asking that question."

Notwithstanding these discrepancies and the trial justice's determination that the prosecutor's recollection was more reliable, the trial justice elucidated:

- 11 -

justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the trial justice overlooked or misconceived material evidence in arriving at those findings.") (quoting *Bustamante*, 866 A.2d at 522). For these reasons, we conclude that the trial justice did not err when he determined that the state disclosed that Barboza and Green were in the WPP.

## C

## The WPP Expenditures and Rule 16

Gallop also maintains that the state violated Rule 16 when it failed to provide discovery related to the expenditures incurred as a result of Barboza's and Green's participation in the WPP. Although Gallop claims that the amount received by the two eyewitnesses was approximately $18,000, our examination of the record establishes that in the period leading up to trial, only the minimal amount of $2,500 was expended for Barboza's participation.[6] With respect to the amount expended

"[I]n no way am I suggesting that [trial counsel's] performance, either at trial or at the [postconviction-relief] hearing, was unprofessional, substandard, or ineffective. He is a highly regarded practitioner, just as is [the prosecutor].

"I simply find that with respect to this issue, I believe [the prosecutor's] recollection is better and more reliable than his."

[6] Our review reveals that the witness protection review board approved approximately $18,000 in expenditures for both Barboza and Green, but only $2,500 was expended on behalf of Barboza's protection. *See* § 12-30-4. We discern no

- 12 -

for Green's protection, the record is silent.  Critically, Gallop fails to direct our attention to any provision of Rule 16 requiring such disclosure, and our review discovers none.

This Court has recognized that "with respect to 'persons whom the state expects to call as witnesses,' Rule 16 * * * requires that the state produce only prior recorded statements of a witness, a summary of the witness's expected trial testimony, and any records of prior convictions." *State v. Chalk*, 816 A.2d 413, 418 (R.I. 2002) (brackets omitted) (quoting Super. R. Crim. P. 16).

Here, the expenditure information does not fall within the above-identified categories.  Nor does the information fall within any provision of Rule 16 requiring disclosure. *See* Super. R. Crim. P. 16(a)(1)-(10).  While such information, to the extent it existed, could have been sought through a motion for promises, inducements, and rewards—or a similar and common defense request—trial counsel candidly acknowledged that no such motion or request was filed.  In the absence of a court order or rule requiring the disclosure of the WPP expenditure information, the state's nondisclosure did not violate Rule 16.[7]

evidence that any funds were paid directly to either eyewitness in exchange for their testimony.

[7] The petitioner's reliance upon *State v. Stravato*, 935 A.2d 948 (R.I. 2007), and *State v. Adams*, 481 A.2d 718 (R.I. 1984), is misplaced.  In *Stravato*, the defendant filed a request for discovery, and we determined that pursuant to Rule 16(a)(8) of the Superior Court Rules of Criminal Procedure, the state was required to disclose a

## D

## The WPP Expenditures and *Brady*

Finally, we consider petitioner's contention that the state violated *Brady* when it failed to disclose the WPP expenditures. The record is silent concerning whether the state disclosed to the defense the $2,500 expenditure incurred for Barboza's protection.

"Beyond the mandates of Rule 16, the due process clause of the federal constitution, as interpreted by *Brady* and its progeny, require the state to turn over certain information." *Briggs*, 886 A.2d at 754-55. "Regardless of whether a defendant requests the information, 'the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.'" *Id.* at 755 (deletion omitted) (quoting *Cronan ex rel. State v. Cronan*, 774 A.2d 866, 880 (R.I. 2001)). "Material evidence, either in the nature of exculpatory or impeachment evidence, must be sufficiently central to the criminal case; there must

victim-impact statement containing statements of the complaining witness. *See Stravato*, 935 A.2d at 955-56. The failure to do so, we concluded, represented a deliberate nondisclosure. *See id.* at 956. Similarly in *Adams*, we observed that the defendant "moved under Rule 16(a)(5) for discovery of all scientific tests and any tangible evidence connected thereto." *Adams*, 481 A.2d at 722. When the state failed to disclose a scientific report, this Court concluded that "the prosecutor was absolutely without authority to interpret Rule 16(a)(5) so as to excuse the nondisclosure * * * on the basis that it would not be used at trial." *See id.* at 724.

- 14 -

be 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (footnote omitted) (quoting *Cronan*, 774 A.2d at 880).

"While the United States Supreme Court has chosen to tailor its analysis toward the impact of nondisclosure on the trial outcome, we * * * adopt[ed] a variable standard of materiality based on the degree of prosecutorial culpability." *State v. Wyche*, 518 A.2d 907, 910 (R.I. 1986). "When the failure to disclose is deliberate, this [C]ourt will not concern itself with the degree of harm caused to the defendant by the prosecution's misconduct; we shall simply grant the defendant a new trial." *Id.* In so doing, "[t]he prosecution acts deliberately when it makes 'a considered decision to suppress for the purpose of obstructing' or where it fails 'to disclose evidence whose high value to the defense could not have escaped its attention.'" *Id.* (brackets and deletions omitted) (quoting *United States v. Keogh*, 391 F.2d 138, 146-47 (2d Cir. 1968)).

In cases involving inadvertent nondisclosure, we examine "the prejudicial effect of the nondisclosure." *Chalk*, 816 A.2d at 419. Under these circumstances, the "defendant bears the burden of establishing that it was prejudicial * * * by showing that the nondisclosed evidence was material because 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

As noted, at the conclusion of the postconviction-relief hearing, petitioner alerted the trial justice that the bench decision did not address the issue of expenditures. The trial justice responded, "I don't think it's at all meaningful or material at all. And I would not in any way suggest by nuance, or hint, or scintilla, or iota of evidence that this has anything whatsoever to do with this [postconviction-relief] hearing and the outcome of the case." We agree with the trial justice's conclusion.

## 1

### Reason for the Nondisclosure

"The first factor we examine in the due process inquiry is the reason for the nondisclosure." *Chalk*, 816 A.2d at 418. Although Gallop repeatedly claims the state's nondisclosure was deliberate, he provides no authoritative support or explanation for that conclusionary statement. It is undisputed that the state disclosed that Green was in the WPP; additionally, the trial justice concluded that the state disclosed that Barboza was in the WPP. Those findings are meaningful and lead to the inescapable conclusion that expenditures would, in all likelihood, be incurred on their behalf. Trial counsel confirmed this reasoning, testifying that based upon his awareness that Green was in the WPP, he "assumed that there would be some expenditure * * *. I mean, that's only natural."

To be sure, trial counsel testified that he did not anticipate expenditures for Barboza, most notably because, he believed, the state failed to disclose that she was in

- 16 -

the WPP. But this testimony does not advance petitioner's position because the trial justice rejected that argument. Having concluded that the state also revealed that Barboza was in the WPP, *see supra*, it remains "only natural" that expenditures would, in all likelihood, have been incurred on her behalf.[8]

Based upon the foregoing, we are satisfied that the state's nondisclosure of the $2,500 expenditure (and the nearly $18,000 that had been approved for expenditures) did not represent "a considered decision to suppress for the purpose of obstructing" or constitute "evidence whose high value to the defense could not have escaped its attention." *Chalk*, 816 A.2d at 419 (emphasis, deletions, and brackets omitted) (quoting *Cronan*, 774 A.2d at 880). In short, "there is nothing in the record of the instant case indicating that this was a deliberate nondisclosure." *Gordon*, 18 A.3d at 475; *see also Briggs*, 886 A.2d at 759 ("[D]efendant fails to point to evidence that persuades us that the state made a 'considered decision' to withhold the evidence.").

---

[8] Our review of the record reveals additional evidence that supported the trial justice's conclusion that Gallop and trial counsel were aware—or should have been aware—that Barboza was in the WPP. During the postconviction-relief hearing, trial counsel was confronted with trial testimony showing that he asked Barboza if she was in fear of Gallop. Based upon that inquiry, trial counsel acknowledged that he must have had some indication that Barboza was in fear of petitioner. Trial counsel further acknowledged knowing that Barboza had two family members killed within weeks of the Passions nightclub shooting and that Barboza was a reluctant eyewitness "based on the neighborhood that [she and Gallop] grew up in." These considerations advance the conclusion that trial counsel and Gallop were aware—or should have been aware—that Barboza was a reluctant eyewitness who feared Gallop and was a prime candidate for the WPP.

**2**

**The Materiality Prong**

"When, as here, the nondisclosure was unintentional, we next consider the prejudicial effect of the nondisclosure." *Chalk*, 816 A.2d at 419. "In these circumstances, defendant bears the burden of establishing that it was prejudicial * * * by showing that the nondisclosed evidence was material because 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Strickler*, 527 U.S. at 280). After reviewing the record, we conclude that Gallop has not satisfied his burden.

This Court has recognized, "evidence is not considered suppressed and, therefore, a new trial is not necessary if the defendant knew or should have known of the essential facts permitting him to take advantage of that evidence." *State v. McManus*, 941 A.2d 222, 230 (R.I. 2008). Here, the record is clear that the state disclosed that Barboza and Green were in the WPP, and therefore we are satisfied that Gallop knew—or should have known—that both eyewitnesses could have incurred WPP expenses. As trial counsel testified, "that's only natural."

Of equal importance, the $2,500 expended for Barboza's protection prior to and during trial was *de minimis*, and the evidence of Gallop's guilt was overwhelming. Gallop was identified as the shooter by two eyewitnesses with no connection to each other. Green—regarding whom the record is silent concerning whether she incurred any

WPP expenditures—testified that she was approximately eight feet from the shooter and after hearing the initial gunshot, she concentrated on Gallop for five to ten seconds. She had never interacted with Gallop but within days of the shooting, she identified him from a photographic lineup. Independently, Barboza had known petitioner for more than fifteen years and was focused upon him in the moments before the shooting, testifying that "I just knew there wasn't going to be a good outcome." Barboza related that she had a "clear view" as she witnessed him lift his hoodie, retrieve a firearm, aim it at Parrish, and shoot. Because Barboza had known Gallop since childhood and had witnessed the shooting, her identification was a direct hit to the defense.

Daniel O'Connell, a detective with the Providence Police Department, also testified that nine days after the shooting, on December 23, 2008, he arrived at the Massachusetts State Police barracks to bring Gallop into custody. Before leaving the barracks, Det. O'Connell escorted petitioner into a nearby interview room; without being prompted, Gallop spontaneously queried, "What do you get for murder in Rhode Island?" Immediately, Det. O'Connell read Gallop his constitutional rights and upon being questioned, petitioner not only denied being in Providence on the date of the shooting but insisted that he had not visited Providence during the preceding year.

The state submitted evidence that contradicted Gallop's exculpatory denial. Joseph Trawicki, an employee with Sprint Nextel, testified concerning the location of Gallop's cellphone in the moments before and after the shooting. Trawicki related that

- 19 -

at approximately 2:07 a.m.—about twenty minutes before the shooting—Gallop's cellphone relayed off a tower near 59 Central Street in Providence. Trawicki continued to testify concerning petitioner's cellphone, tracking its movement at 2:27 a.m. to Providence, at 2:29 a.m. to East Providence, and thereafter into Massachusetts. Detective O'Connell testified that 59 Central Street—the location of the cell tower that connected to Gallop's cellphone in the minutes before the shooting—was approximately 150 to 200 yards from the crime scene. The petitioner's claim that he was not in Providence on the morning of the shooting—or during the preceding year—was soundly repudiated.

In the face of this damning evidence, the record demonstrates that trial counsel performed admirably and professionally. He impeached Barboza, noting that her identification was made nearly a year after the shooting and after multiple failed opportunities to alert law enforcement that Gallop was the person who murdered her friend. This point was vociferously argued during closing arguments when trial counsel suggested that, in the year between the shooting and the identification, Barboza heard from others that Gallop was the shooter. Trial counsel also attacked the ability of Barboza to make an accurate identification when she was approximately 100 feet from the shooter, who, at that time, was intermingled with an estimated 400 to 600 other people exiting the nightclub; and trial counsel also challenged Green's ability to make

- 20 -

an accurate identification when she admittedly had been drinking prior to the shooting and testified that she was only 90 percent certain that Gallop was the shooter.

Additionally, trial counsel referenced the medical examiner's testimony that the trajectory of the bullet entered Parrish's midlevel and traveled in an upward path. As argued, Gallop and Parrish were both six feet tall, and thus, "No way. No way * * * two people of equal height, strikes them in upward trajectory like that as demonstrated by the medical examiner. No way."

Considering the state's evidence of guilt and trial counsel's wide-ranging impeachment efforts, we cannot conclude that had the $2,500 WPP expenditure been disclosed, there was a reasonable probability that "the result of the proceeding would have been different." *Chalk*, 816 A.2d at 419 (quoting *Strickler*, 527 U.S. at 280); *see also Mastracchio v. Moran*, 698 A.2d 706, 715 (R.I. 1997) ("We conclude in light of the self-corroborating nature of the testimony given by Gilbert to the jury at Gerald's trial, and the exposure to the jury by defense counsel of Gilbert's criminal and personal background, that the so-called posttrial newly discovered evidence relating to Gilbert's activities while in police custody, even if known to the trial jury, would not have in any circumstance created a reasonable probability that the jury's verdict would have been any different.").

In this regard, the record details the inculpatory risk to Gallop in eliciting testimony that the eyewitnesses had been afforded protection because they feared him

and that Barboza had incurred the minimal amount of $2,500 in WPP expenditures. Such a line of inquiry, trial counsel indicated, is "detrimental in my opinion to the client's interests * * *." Indeed, not only would this line of questioning have informed the jury that the man on trial for murder was feared by the two eyewitnesses, but trial counsel also testified that he believed it was "legitimate that [the state] would pay relocation expenses for however long the [s]tate felt it was necessary for either witness." Admittedly, trial counsel pondered, "[w]hen you're starting in at that 5, 10, 15 thousand dollar range, you know, maybe [that] changes the calculations somewhat. I don't know." But, when the amount expended was less than $5,000, trial counsel suggested during his deposition, "I don't think my advice -- you know, it's hard to say, but probably would not have changed, don't go down that road, it's opened up a lot of doors."[9]

At bottom, if the state had disclosed that Barboza received $2,500 in WPP expenditures, it is entirely speculative whether Gallop would have used this disclosure to elicit additional impeachment evidence, particularly in light of trial

_____

[9] Trial counsel's deposition testimony, which was marked as a full exhibit during the postconviction-relief hearing, related to Green; however, the rationale remains constant. The $2,500 expended on Barboza was *de minimis*, and particularly so when considering that impeaching Barboza on the WPP expenditures would necessarily reveal that she was in the WPP. *See, e.g.*, *Commonwealth v. Treiber*, 121 A.3d 435, 462 (Pa. 2015) ("Appellant fails to acknowledge Mr. Pianta was essentially placed in a witness-protection program because he feared appellant would retaliate after he implicated him in the arson and murder * * *. The challenged evidence was not material or helpful to appellant, as it would have raised the inference he would retaliate.").

- 22 -

counsel's understandable concern that the jury not learn that the eyewitnesses were in the WPP and in fear of Gallop. "In our opinion, [petitioner] merely raising the possibility of doing so is not sufficient to establish that, had the evidence been produced sooner, there is a reasonable probability that [Gallop] would not have been convicted." *Chalk*, 816 A.2d at 419. Considering trial counsel's already extensive impeachment efforts, "any additional impeaching statements 'would merely have been cumulative for impeachment purposes,' and thus they 'fail the test of the likelihood that they would have produced a reasonable doubt of guilt.'" *Id.* at 420 (brackets omitted) (quoting *State v. Bassett*, 447 A.2d 371, 377 (R.I. 1982)). Gallop has failed to identify "how his defense would have been different had he learned about the [WPP expenditures or approvals] sooner." *Id.*

Finally, it is significant that Barboza and Green both identified Gallop as the shooter well *before* entering the WPP. *After* entering the WPP in 2010, their identifications never changed. *See Mastracchio v. Vose*, 274 F.3d 590, 604 (1st Cir. 2001) ("The fact that Gilbert had staked out his position well before he received any emoluments renders remote any possibility that the jury would have thought that he had fabricated his story in return for cash."); *Mastracchio*, 698 A.2d at 718 ("Gilbert's testimony * * * was completely consistent with at least three prior statements given by him in 1985 before his witness-sentence agreement with the state and before the occurrence of the alleged abuses of Gilbert's confinement.").

Consequently, we conclude that Gallop has failed to demonstrate that the nondisclosure was prejudicial.

## Conclusion

For the reasons stated, the judgment of the Superior Court is affirmed.  The papers in this case are remanded to the Superior Court.

# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903



## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Dana Gallop v. State of Rhode Island. |
| **Case Number** | No..2023-82-M.P. (PM 16-2668) |
| **Date Opinion Filed** | November 26, 2025 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Christopher R. Bush<br>Department of Attorney General<br><br>For Petitioner:<br><br>Richard K. Corley, Esq. |